GLOUCESTER ICE AND COLD STORAGE CO. *vs.* ASSESSORS OF GLOUCESTER & others.

Essex. December 4, 5, 1957. — February 12, 1958.

Present: WILKINS, C.J., RONAN, SPALDING, WHITTEMORE, & CUTTER, JJ.

*Taxation*, Real estate tax: public property used for nonpublic purpose, Gloucester fish pier, leased property. *Landlord and Tenant*, Taxation. *Gloucester.*

A portion of the State Fish Pier in Gloucester, subleased to one engaged in private business related to the fishing industry by a charitable corporation which had been organized to administer the pier for the benefit of that industry and was lessee of the pier under a lease from the Commonwealth, its owner, was taxable by the city of Gloucester to the sublessee for the real estate tax under G L. (Ter. Ed.) c. 59, § 3A, as appearing in St. 1951, c. 667, § 1. [26–27]

A charitable corporation which had been organized to administer the State Fish Pier in Gloucester for the benefit of the fishing industry and was lessee of the pier under a lease from the Commonwealth, its owner, and which subleased a portion of the pier to one engaged in private business related to the fishing industry by a sublease not containing any provision obligating the sublessee to pay taxes, was required under G. L. (Ter. Ed.) c. 59, § 15, to reimburse the sublessee for the amount of a real estate tax assessed by the city of Gloucester to the sublessee under § 3A, as appearing in St. 1951, c. 667, § 1. [32–34]

BILL IN EQUITY, filed in the Superior Court on February 28, 1957.

The suit was heard by *Morton*, J.

*Harry Bergson*, (*Harry Bergson, Jr.*, with him,) for the plaintiff.

*James H. Bagshaw*, City Solicitor, for assessors of Gloucester and another.

*Melvin I. Bernstein*, (*Carlton W. Wonson* with him,) for Gloucester Community Pier Association, Inc.

CUTTER, J. This is a bill for declaratory relief brought by the plaintiff (hereinafter called Cold Storage), the sublessee of premises on the State Fish Pier in Gloucester, to deter-

mine (a) whether the premises occupied by it are taxable to it as real estate by the city of Gloucester, and (b) if such premises are taxable to Cold Storage, whether Cold Storage is entitled to have the taxes paid by it to the city reimbursed by its lessor, the defendant Gloucester Community Pier Association, Inc. (hereinafter called Association). Association leases from the Commonwealth the whole pier premises, of which those subleased by Cold Storage form a part. The same general situation was discussed in *Dehydrating Process Co. of Gloucester, Inc.* v. *Gloucester,* 334 Mass. 287. The facts are not in dispute.

The State Fish Pier was originally authorized by St. 1931, c. 311, § 1, "[f]or the purpose of improving and developing Gloucester harbor for the promotion of the fish industry and the commercial facilities of . . . Gloucester." It was completed in 1938. On March 1, 1937, the Commonwealth executed a lease [1] of the pier to Association for a term expiring in 1949, which in 1945 was extended to September 30, 1969.

Association is a nonprofit, "charitable" corporation formed in 1936 under the general law governing such corporations, G. L. (Ter. Ed.) c. 180, as contemplated by St. 1937, c. 29, § 1, "for the purpose of administering said pier and its facilities without profit and in such manner that said pier and its facilities shall be available . . . to fishermen, fish dealers and the fishing industry generally." Originally, Association's members were all members of the Gloucester city administration as provided in c. 29. By St. 1954, c. 252, § 1, the membership was changed to consist of "five . . . residents . . . of Gloucester, to be appointed by the mayor for terms of three years."

Association in 1938 [2] entered into a sublease of a large

---

[1] Association under its lease from the Commonwealth agreed to pay "all water or sewer rates and all annual taxes which may be lawfully assessed upon the premises leased." This provision was obviously only for the benefit of the Commonwealth and not for the benefit of Association's sublessees. It does not affect the issues here raised.

[2] In 1947, the Commonwealth expanded the pier facilities somewhat. Cold Storage then assumed new obligations, not here relevant, with respect to the property subleased to it.

storage building on the premises to Cold Storage (a business corporation engaged in manufacturing ice and freezing and storing fish) for a term of ten years with a right of renewal for an additional twenty years. Cold Storage was required to pay rent and charges for water, sewer and electricity; to make its own charges for ice, freezing fish, or cold storage reasonable, competitive, and the same to all persons; and to offer its services to all proper persons without favoritism. The sublease imposed no express obligation on Cold Storage to pay taxes.[3] In 1945, the sublease to Cold Storage was extended to September 30, 1969.

General Laws (Ter. Ed.) c. 59, § 3A, as appearing in St. 1951, c. 667, § 1, reads in part: "Real estate owned by or held in trust for the benefit of *the commonwealth or* a city or town, if used or occupied for other than public purposes, shall be taxed to the lessee or lessees thereof, or their assigns, or to the occupant or person in possession thereof, in the same manner and to the same extent as if the said lessee or lessees or their assigns or the occupant or person in possession were the owners thereof in fee, free of any trust. This section shall apply to real estate which shall have been acquired by virtue of the provisions of a will or deed, and held by *the commonwealth or* any city or town in trust for public charitable purposes, whether or not the same is subject to a duly recorded lease which provides that the lessee shall assume or pay all taxes assessed thereon." [4] General Laws (Ter. Ed.) c. 59, § 15, reads: "If a tenant paying rent for real estate is taxed therefor, he may retain out of his rent the taxes paid by him, or may recover the same in an action against his landlord, unless there is a different agreement between them."

Purporting to act pursuant to § 3A, the Gloucester assessors, as of January 1, 1956, assessed to Cold Storage real

[3] The absence of a provision in the sublease to Cold Storage, imposing upon the latter the burden of real estate taxes, is not significant. When that sublease was made in 1938, was extended in 1945, and was modified in 1947, the whole pier property (as land of the Commonwealth) was subject to no taxes, and such a provision was presumably omitted as irrelevant.

[4] As originally passed by St. 1928, c. 111, § 1, the italicized words "the commonwealth or" were omitted. They were inserted by St. 1951, c. 667, § 1.

estate taxes in the sum of $19,177.71 with respect to the premises leased by it from Association. Cold Storage paid the taxes with interest under protest.[5] Cold Storage thereupon deducted (see § 15, *supra*) the amount of the taxes so paid by it from the next rent payable by it to Association. Association has notified Cold Storage that the withholding of this amount from its rent is a breach of the sublease and threatens to evict Cold Storage. If all subtenants (whose subleases also impose on them no express obligation to pay taxes) of Association make similar deductions, Association will be unable to pay its rent to the Commonwealth. Cold Storage, fearing that termination of the principal lease from the Commonwealth to Association will terminate its sublease, seeks declaratory relief.

The trial judge found the material facts to be substantially as stated in the bill in equity, from which they have been summarized above. He ruled that § 15 has no application to real estate, taxable under § 3A, of the Commonwealth or a city; that Association "is really a part of the city of Gloucester";[6] and that the "Legislature did not intend that a tax could be assessed . . . and then have the city which imposed the tax immediately . . . obliged to return the amount of the tax to the taxpayer." He ordered a decree entered declaring that Cold Storage is not exempt from taxation under § 3A and that it is "not entitled to withhold from . . . rent due . . . Association the amount paid . . . on account of real estate taxes assessed to it as occupant of the leased premises." Cold Storage appeals from the final decree thereafter entered.

1. It is settled by the *Dehydrating* case (334 Mass. 287) that real estate taxes may be levied against Cold Storage

---

[5] Action to recover the payment has been brought under G. L. (Ter Ed.) c. 60, § 98.

[6] As we view the facts, Association was separate from the city as contemplated by St. 1937, c. 29, § 1. Formed under the general charitable corporation law (G. L. c. 180), it was a separate corporate entity, even if it had some of the aspects of a special municipal "authority" in view of the essentially public function which it was designed to serve. Compare the urban redevelopment corporations considered in *Opinion of the Justices*, 334 Mass. 760, 762–763. Throughout this opinion, Association is dealt with as a separate corporate entity and not as a part of the city of Gloucester.

under § 3A. The property subleased to Cold Storage is land of the Commonwealth used for other than public purposes. The character of the use is not "determined by the activities of the holder of the principal lease," namely Association (see *Dehydrating* case at pages 291–292). As was said in *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 65, "[a]lthough the maintenance of the pier as a facility was a proper public purpose to assist the important fishing industry, the use of the pier by the sublessees in their own businesses was held . . . not to be for a public purpose." It is for the Legislature to decide to what extent it will assist the execution of a public purpose. Here the Legislature has made no express provision for tax exemption of the pier in the hands of tenants operating for private profit, comparable to the specific tax exemption considered in the *Cabot* case (at pages 63–65), but has contented itself with assisting the fishing industry by the construction of basic facilities, leaving them taxable under § 3A to private business occupants, even though such occupants directly and indirectly contribute to the accomplishment of the public purposes.

2. The remaining question is whether Cold Storage is entitled to reimbursement from Association for the amount of the tax. Section 15, enacted long prior to § 3A, has been in effect in essentially its present form since Gen. St. (1860) c. 11, § 9.[7] Section 3A was first enacted by St. 1928, c. 111, § 1[8] probably following in some degree the precedent estab-

---

[7] See Nichols, Taxation in Massachusetts (3d ed.) pages 271–275; Adams and Wadsworth, Hall's Massachusetts Law of Landlord and Tenant (4th ed.) §§ 77, 81, 82; Swaim, Crocker's Notes on Common Forms (7th ed.) § 732

[8] This was based on 1928 House Bill No. 391 which, as presented, related only to "[r]eal estate . . . held by any city . . . in trust for public charitable purposes . . . if . . . the same is subject to a lease which provides that the lessee shall . . . pay all taxes assessed." It was revised in 1928 House Bill No. 976, to include a provision that real estate "owned by . . . a city . . . if used or occupied for other than public purposes, shall be taxed to the occupant or person in possession thereof to the same extent that other real estate is taxed" and to its final form by 1928 Senate Bill No. 251. The taxes imposed by the provision added by House Bill No. 976 did not depend upon any express arrangement in a lease for the lessee's or occupant's assumption of the tax burden. Indeed, in a separate paragraph of House Bill No. 976, the taxability of land held by a city upon a public charitable trust continued to depend on the existence of a provision in the lease of the land for business purposes putting the tax burden upon the lessee. The absence of such a pro-

lished in 1922 with respect to property "owned by the city of Boston . . . if leased for business purposes." See St. 1922, c. 390, § 1[9] and other earlier precedents mentioned below.

Mr. Justice Gray in *Ammidown* v. *Freeland,* 101 Mass. 303, 309, said, "It is within the province of the legislature to determine not only which party shall pay the amount of the tax to the government, but upon whom the burden shall finally rest, and also . . . to provide that the amount of the tax shall be paid by one party to the government and recovered by him from the other party or deducted upon a final settlement with him." See also *Merchants National Bank* v. *Merchants National Bank,* 318 Mass. 563, 572–574. "It is not always easy to determine where the ultimate burden of a tax . . . falls" (see *United Shoe Machinery Corp.* v. *Gale Shoe Manuf. Co.* 314 Mass. 142, 156), but it here must be decided whether the 1951 Legislature by § 3A provided that the ultimate tax burden should rest (in the case of real estate of the Commonwealth used for other than public purposes) upon the lessee or occupant without right of reimbursement under § 15 from any lessor. The cases just cited indicate that the Legislature has constitutional power to determine that the occupant shall bear the ultimate burden of the tax.

Section 3A, as originally enacted in 1928, dealt only with the land of cities and towns (but not that of the Commonwealth) used for other than public purposes. Section 3A first was made applicable (see footnote 4, *supra,* and related

---

vision with respect to other city land tended to show that with respect to such other land the lease provisions were of no importance. In the final draft of the bill, the terms of leases were expressly made irrelevant in the case of city land held in trust for public charitable purposes (see, however, footnote 14, *infra*).

[9] In 1922, Boston had recently received by devise a substantial amount of real estate subject to long term leases which provided that the lessees must pay the taxes. The legislative history of this statute, which continued the power of the city to collect taxes from these lessees (and from certain other lessees), had some tendency to indicate that the ultimate burden of the tax would rest only on lessees whose leases provided that they must pay the tax. See 1922 House Doc. No. 1473. There is no indication that the legislative history of the 1922 act was ever considered in connection with the enactment of the 1928 statute. In *Stoneman* v. *Boston,* 263 Mass. 255, 260, which arose under the 1922 act, it was not necessary to decide whether § 15 was applicable, because the lessee there involved was required by his lease to pay all taxes.

text) to land of the Commonwealth by St. 1951, c. 667, § 1. After 1928 and prior to 1951, if § 15 had been applied to land owned and leased (without an express provision for the payment of taxes by the lessee) by a city to a private business occupant, there would have been a strange result. The city would have assessed the tax to the business occupant, would then have collected the tax from the occupant, and, as an immediate consequence, would then have become liable to refund the amount of tax under § 15 to the same occupant. It is persuasively argued that the 1928 Legislature could not have intended this futile circuity of payment and reimbursement. See *Selectmen of Topsfield* v. *State Racing Commission*, 324 Mass. 309, 314; *Foley* v. *Lawrence*, 336 Mass. 60, 64. See also *Rossire* v. *Boston*, 4 Allen, 57, 59. Plainly, a determination that § 15 was applicable to land taxable prior to 1951 under § 3A would not have rendered § 3A entirely meaningless, for it would still have had application in cases where leases from a city obligated the lessee to pay taxes. However, the language of § 3A is broad enough for the section reasonably to be construed as a specific direction that the lessee or occupant of land taxable under the section bear the burden of the tax,[10] notwithstanding the provisions of § 15.

Obviously, if, prior to 1951, § 3A in fact determined that city land leased for business purposes was to be taxed to the lessee or occupant without right of reimbursement from his lessor under § 15, then the same result must be reached after 1951 with respect to land of the Commonwealth leased for business purposes. In the 1951 act there is no indication that § 3A means anything different with respect to Commonwealth land leased for business purposes than it meant with respect to city land thus leased before 1951.[11]

---

[10] Except perhaps in cases where the lease provided expressly that the lessor should bear it.

[11] The legislative history shows that the same meaning was intended. The 1951 legislation was recommended by the then commissioner of corporations and taxation in these words, "7. . . . When property of a city or town is used or occupied for other than public purposes, provision is made for taxation thereof to the lessee or occupant. It is recommended that similar provisions be made applicable to property of the Commonwealth." 1951 House Doc. No. 12, page 3. See accompanying bill in 1951 House Bill No. 19.

The fact that § 3A was enacted long after the decision in *Boston Molasses Co.* v. *Commonwealth,* 193 Mass. 387, however, must be taken into account in considering the relation of § 15 to § 3A. The *Boston Molasses Co.* case involved a tax imposed under St. 1904, c. 385, § 1. That statute provided that certain lands of the Commonwealth in South Boston known as the Commonwealth Flats "shall, if leased for business purposes, be taxed by the city of Boston to the lessees thereof, respectively, in the same manner as the lands and buildings thereon would be taxed to such lessees if they were the owners of the fee." The molasses company, as lessee of such land, sought reimbursement from the Commonwealth, its lessor, of the Boston taxes assessed upon and paid by the company. This court (at page 389) held that the Commonwealth, in making the lease, was acting in "the position of a private citizen" and that whether it must reimburse the molasses company "must depend in the first instance upon the terms of" the lease. The lease provided for the payment by the lessee of taxes assessed on buildings placed upon the property by the lessee but did not provide for the lessee's payment of further taxes upon the land and other structures. This court stated (at page 391) that the burden of these "further taxes lawfully assessed upon the leased property must, as between these parties, fall finally upon the lessor. The tax is a charge upon the owner by reason of his ownership, and must fall upon him so far as he has not guarded himself therefrom by the terms of his lease." It was stated that "the common law rule . . . 'where the lease is silent upon the subject, imposes upon the lessor the obligation to pay the taxes upon the leased property.'" See Am. Law of Property, § 3.76; McQuillin, Municipal Corporations (3d ed.) §§ 44.59, 44.71. The *Boston Molasses Co.* case has been cited in various cases,[12] but none of them appears to control the present case.

---

[12] See *Grasselli Chemical Co.* v. *Assessors of Boston,* 281 Mass. 79, 81, which (like *Boston Fish Market Corp.* v. *Boston,* 224 Mass. 31, 33–36) involved St. 1909, c. 490, Part I, § 12, relating to the Commonwealth Flats. In each case, there was a covenant to pay taxes by the assessed lessee, so the present

In *Boston* v. *Quincy Market Cold Storage & Warehouse Co.* 312 Mass. 638, 645, it was said that "statutes providing to whom a tax on real estate shall be assessed and who shall be liable for its payment in the first instance do not determine upon whom the final liability is cast. . . . These statutes are for the convenience of the assessing and collecting officers." There is substantial ground, however, for regarding this last statement as not applicable to § 3A for it is apparent that the amendments both in 1928 and 1951 were intended as substantive amendments of the law, permitting affirmatively the taxation of hitherto tax exempt property, not to the entities in whose hands it would be tax exempt but to its users for business purposes, who, if treated as if they "were the owners thereof in fee, free of any trust," might reasonably be expected to contribute to the support of government by an annual tax based upon their respective interests in real estate on the assessment date.

In the *Quincy Market* case, while dealing with issues not involved in the present case, the court considered § 15 as having bearing by analogy to the issues then before it. It cites the *Boston Molasses Co.* case as authority for the principle that "if there were no such statute [as § 15], there would be such a right of recovery at common law" (pages 645–646). However, in the *Quincy Market* case, there was no doubt that the person assessed and required to bear the ultimate burden of the tax was the full beneficial owner who should bear his share of the burdens of government, whereas, in the case of the otherwise exempt properties taxable under § 3A by reason of their use for business purposes, the justi-

question (where Cold Storage has given no such covenant) was not raised. See also *Lovejoy* v. *Bailey,* 214 Mass. 134, 156; *Stony Brook Railroad* v. *Boston & Maine Railroad,* 260 Mass. 379, 385 (specification in a lease of certain taxes to be paid by lessee means that others not mentioned are to rest on the lessor and that "the general rule is to be followed to the effect that taxes in the absence of agreement rest on the lessor and not on the lessee"; *Stoneman* v. *Boston,* 263 Mass. 255, 260 (see footnote 9, *supra*); *Barry* v. *Frankini,* 287 Mass. 196, 199 (statement of general rule as to burden of taxes between lessor and lessee, but in the particular case, the lessor had agreed to pay all taxes); *Eastern Massachusetts Street Railway* v. *Boston Elevated Railway,* 310 Mass. 659, 669 (general rule stated). Compare *Pittsfield & North Adams Railroad* v. *Boston & Albany Railroad,* 260 Mass. 390, 397.

fication for their taxation (rather than exemption) is the user's business interest in them on the tax date rather than the property interest of the exempt owner.

The foregoing conflicting considerations bear upon the interpretation of § 3A. If it were not for the *Boston Molasses Co.* case, we would feel (a) that § 3A, as originally enacted in 1928 and as expanded in 1951, was intended by the Legislature to tax (and to impose the final burden of that tax upon) the user of property which except for § 3A would be tax exempt, and (b) that § 15 had no application whatsoever to occupants of lands of the Commonwealth or a city or town taxable under § 3A. The legislative history (see footnotes 8, 11, *supra*) points strongly in that direction, as do the practical consequences of any other interpretation.

It seems to us impractical, however, to distinguish the present case from the *Boston Molasses Co.* case. The 1904 statute considered in the *Boston Molasses Co.* case is in substance very closely similar to § 3A.[13] Section 3A covers a broader range of real estate than does the 1904 statute, but that difference does not affect the principles of the *Boston Molasses Co.* case. Similar considerations govern the fact that § 3A permits assessment to an "occupant or person in possession" instead of only to "lessees" as in the 1904 act. Nor can we find adequate ground for distinguishing § 3A

---

[13] Pertinent provisions of St. 1904, c. 385, § 1.

[Words not found in § 3A italicized]

"*The lands of* the Commonwealth . . . *known as the Commonwealth Flats,* shall, *if leased for business* purposes, be taxed *by* . . . *Boston* to the lessees thereof, *respectively,* in the same manner as *the lands and buildings thereon would be taxed to such* lessees if *they* were the owners *of the* fee, *except that the* payment of the tax shall not be enforced by any lien upon or sale of the *lands* . . . ."

Pertinent provisions of G. L. c. 59, § 3A, as amended in 1951.

[Words not found in 1904 statute italicized]

"*Real estate owned by* . . . the commonwealth . . . *if used or occupied for other than public* purposes, shall be taxed to the . . . lessees thereof, *or their assigns, or to the occupant or person in possession thereof,* in the same manner *and to the same extent* as *if the* . . . lessees *or their assigns or the occupant or person in possession* were the owners *thereof in* fee, *free of any trust.* . . . Payment of the *aforesaid* taxes shall not be enforced by any lien upon or sale of the . . . *real estate* . . . ."

from the 1904 statute by the former's use of the words "and to the same extent" in describing the scope of the tax to be imposed.[14] This refers only to the fact that the whole interest, the fee (see *Boston Molasses Co.* case, at page 388; compare *Squantum Gardens, Inc.* v. *Assessors of Quincy*, 335 Mass. 440, 449), is to be taxed and not merely the leasehold interest. This was the construction given to a later form of the 1904 statute[15] in this respect in *Grasselli Chemical Co.* v. *Assessors of Boston*, 281 Mass. 79, 81 (in the absence of the statutory words "to the same extent"), and, sub silentio, in *Stoneman* v. *Boston*, 263 Mass. 255, 258, 260, to the 1922 statute (see footnote 9, *supra*) which contained the words "to the same extent."[16]

This court has said that, in considering the meaning of a statute, "it . . . must be presumed that the Legislature knew preëxisting law and the decisions of this court." See *Condon* v. *Haitsma*, 325 Mass. 371, 373; *Mathewson* v. *Contributory Retirement Appeal Board*, 335 Mass. 610, 614. We think that this principle must be given great weight in the present case. Even though, as a matter of first impression, the present court might well have reached a result

---

[14] Association is not helped by the provision of § 3A that the section "shall apply to real estate . . . *held* by the commonwealth or any city or town *in trust* for public charitable purposes, whether or not the same is subject to a duly recorded lease which provides that the lessee shall . . . pay all taxes assessed thereon" (emphasis supplied). This provision applies by its terms only to property held in trust and not to other property of the Commonwealth. Indeed the express inclusion of the provision with respect to trust property and its omission with respect to other State property (although possibly mere inadvertence) may give support to the applicability of § 15. See *Iannelle* v. *Fire Commissioner of Boston*, 331 Mass. 250, 252–253.

[15] St 1909, c. 490, Part I, § 12.

[16] Counsel for Association by implication suggests that, in construing § 3A, we should consider G. L. (Ter. Ed.) c. 59, § 3D, inserted by St. 1956, c. 690, § 1, which is expressed in much the same language as § 3A. Presumably, the suggestion is that § 3D is an instance (a) of clear indication of legislative intention to tax the lessee of property of the United States leased to others, where that is constitutionally possible, and (b) of a situation where no recovery by the lessee under § 15 of a tax paid by it would be constitutionally possible. A statute passed in 1956 would be unlikely to give indication of the legislative intention in 1928 and 1951. We place no weight on the fact that the 1956 act followed the earlier language. It is not necessary for us here to consider the relation of § 3D to §§ 11 and 15 and other provisions of c. 59. Various questions presented by § 3D and related sections have already been pointed out in the *Squantum Gardens, Inc.* case, 335 Mass. 440, 446–453.

different from that stated in the *Boston Molasses Co.* case, the case has been accepted as law for half a century. Doubtless, some lessees have entered into leases in reliance upon it. It establishes, in a sense, a rule of property law, not lightly to be overruled. If the Legislature had intended to change a rule of such long standing (as we think it could have done) it would have been natural for it to provide in explicit terms that § 15 and the common law rule mentioned in the *Boston Molasses Co.* case were not to apply to taxes assessed under § 3A. Since it did not do so, we feel that we must hold that § 15 does apply to such taxes.

If, as Cold Storage and Association appear to agree, the result of our holding will be that Association will be unable to pay its rent to the Commonwealth, then it may well be that termination of the main lease will cause termination of the sublease to Cold Storage, so that wholly new arrangements will be necessary. If so, Cold Storage may well have won a Pyrrhic victory. These matters, however, are not sufficiently presented on the present record to require us to consider them.

3. Paragraph 3 of the final decree is to be modified to provide that the plaintiff (Cold Storage) is entitled to withhold from the rent due the defendant Association the amount paid by the plaintiff on account of real estate taxes assessed to it as occupant of the leased premises. As so modified, the decree is affirmed. Costs are not to be allowed.

*So ordered.*