COMMISSIONER OF LABOR AND INDUSTRIES *vs.* BOSTON HOUSING AUTHORITY.

Suffolk. December 7, 1962. — February 6, 1963.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Housing. Jurisdiction,* Housing, Federal field. *Statute,* Construction. *Labor. Words,* "Janitor," "Laborer."

A statute must be construed, if possible, so as to avoid serious doubts as to its constitutionality. [415]

Where, pursuant to the United States Housing Act and the Massachusetts Housing Authority Law, G. L. c. 121, §§ 26I et seq., a local housing authority entered into a "contributions contract" with the Federal Public Housing Administration prohibiting operating expenditures by the local authority in excess of an operating budget submitted to and approved by the Federal Administration, the provisions of c. 121, § 26T, for determination by the Commissioner of Labor and Industries of wage rates to be observed in connection with the administration of local housing projects did not require the local authority to pay wages at rates determined by the Commissioner so high as to result in an operating budget in excess of the budget approved by the Federal Administration and consequent violation of the "contributions contract" and the Federal policy of furnishing low-rent housing. [415–416]

Wage rates determined by the Commissioner of Labor and Industries under G. L. c. 121, § 26T, to be paid in the administration of local housing projects must be observed by the local housing authorities in connection with projects in which there is no Federal participation. [416]

A janitor employed in the administration of a local housing project is a "laborer" within the meaning of G. L. c. 121, § 26T, as amended through St. 1960, c. 491, providing for determination by the Commissioner of Labor and Industries of wage rates to be observed in the administration of such a project. [416–418]

BILL IN EQUITY filed in the Superior Court on August 4, 1961.

The suit was reported by *Voke, J.*

*Raymond F. O'Connell (Lawrence E. Cooke, Assistant Attorney General, with him)* for the plaintiff.

*Thomas B. Shea (Paul F. Liston with him)* for the defendant.

*Ronald P. Corbett,* for Revere Housing Authority, amicus curiae, submitted a brief.

CUTTER, J. The commissioner seeks declaratory relief and "an injunction ordering the . . . authority to pay to its employees . . . the rates of wages . . . determined by the" commissioner under G. L. c. 121, § 26T (as amended through St. 1960, c. 491).[1]  A judge of the Superior Court

---

[1] Section 26T, as thus amended, reads in part, "In the development or administration of a project, a housing authority shall furnish the commissioner . . . with a list of the classifications of work performed by all architects, technical engineers, draftsmen, technicians, laborers and mechanics employed therein . . . . The commissioner shall determine rates of wages and fees and payments to health and welfare plans for each such classification and shall furnish the . . . authority with a schedule of such rates, fees and payments.  The

Commissioner of Labor & Industries *v.* Boston Housing Authority.

reported the case without decision.   The facts are agreed.

The authority (see G. L. c. 121, § 26K, as amended through St. 1954, c. 72, §§ 1, 2) operates twenty-seven housing projects in Boston, including sixteen federally aided projects containing an aggregate of 10,242 dwelling units and producing total annual rents of $6,446,520.   On September 20, 1960, the commissioner asked the authority to supply a list of the classifications of work performed by the groups of employees referred to in § 26T (see fn. 1, *supra*).   The authority did so, and later furnished additional information.   On October 26, 1960, the commissioner determined the wage rates to be paid to employees in certain classifications, and on April 6, 1961, made a similar determination with respect to two other classifications.   A schedule of his wage rate determinations and of certain related Federal wage rate determinations is set out in the margin.[2]

Public Housing Administration (PHA), the successor of United States Housing Authority (see 12 Fed. Reg. 4981),

---

rates of wages and fees paid . . . to such . . . [classes of employees] shall not be less than those determined by . . . [the] commissioner who shall set the rate at no less than eighty per cent of the prevailing wage in accordance with . . . [c. 149, §§ 26, 27].   In the event that any . . . authority fails to furnish . . . said list within two weeks . . . [the] commissioner shall determine said rates . . . fees and payments. . . .   The department of labor and industries shall . . . have power to petition the court for injunction or other appropriate relief against any . . . authority which fails to comply . . . .''

[2] From exhibits attached to the statement of agreed facts (and, with respect to columns 4 and 5 below, from information contained in the authority's brief) the following comparative table of the principal wage classifications discussed in this opinion has been prepared.

| (1) Classifications and Number of Affected Employees | (2) Commissioner's Rates of 10/26/60 and 4/6/61 | (3) Old PHA rates effective 4/1/60 | (4) New PHA rates effective 4/1/62 | (5) Difference between Col. 2 and Col. 4 |
|---|---|---|---|---|
| 5 Firemen CW HP | $2.69 | $2.38 | $2.60 | 9¢ |
| 72 Firemen—LP | 2.56 | 2.25 | 2.45 | 11¢ |
| 8 Building Contr. Lab. | 2.20 | 2.07 | 2.30 | −10¢ |
| 14 Appliance Men | 2.35 | 2.35 | 2.55 | −20¢ |
| 175 Janitors | 2.20 | 1.93 | 2.12 | 8¢ |
| 2 Welders | 3.28 | No PHA rate | | |
| 1 Junior Development Aide | 4160–4800 | No PHA rate | | |
| 1 Senior Devel. Aide | 4800–6000 | No PHA rate | | |

[The rates for carpenters, electricians, glaziers, painters, plumbers, steamfitters, bricklayers, cement masons, and plasterers are omitted.]

The PHA wage rates of April 1, 1960, and the PHA rates effective April 1, 1962, are discussed later in this opinion.   See fn. 4, *infra*.

was originally created in 1937 by Pub. Law (75th Cong., 1st Sess.) 412, 50 Stat. 888–899, now found, as amended, in 42 U. S. C. §§ 1401–1435 (1958). See 42 U. S. C. §§ 1401–1436 (Supp. III, 1962). On June 24, 1959, the authority entered into a "consolidated annual contributions contract" with PHA. Section 407 of part two of this contract (as amended) requires the authority to submit to PHA its proposed annual operating budgets for each project (or on a consolidated basis for all the authority's projects). The authority (after an initial period) may "not . . . incur any operating expenditures . . . except . . . in accordance with an . . . operating budget," approved by PHA, with certain exceptions not here relevant. See § 407(H). The authority may submit to PHA requests for revision of any approved budget. The budget, in various respects, is clearly important in assisting PHA "to assure the low-rent character of the project." The contract (part two, §§ 415, 418) provides in effect that the annual contribution shall be within a stated maximum.[3]

On or before August 12, 1960, PHA "made a comprehensive survey of the prevailing wage rates being paid by public and private employers in the . . . Boston [area] to like classifications of employees of . . . [the] authority in order to determine the prevailing wage rates in compliance with . . . [§] 16 (2) of the United States Housing Act as amended [42 U. S. C. § 1416 (2) (1958)]. . . . [O]n August 12, 1960 . . . [PHA] made prevailing wage rate deter-

---

[3] Part two of the contract contains other significant provisions. Section 119 (B) provides that substantial "disputes concerning prevailing wage rates or classifications . . . shall be . . . reported to . . . PHA for decision or, at the option of . . . PHA, referral to the Secretary of Labor . . . . The decision of . . . PHA or the Secretary of Labor . . . shall be final." Section 201 requires the authority to operate each project efficiently and "solely for . . . providing decent . . . dwellings . . . within the financial reach of families of low income." Section 202 requires preservation of the "low-rent character" of each project. Section 205 regulates rents. Section 215 requires the authority to pay "to all . . . maintenance laborers and mechanics, not less than the . . . wages prevailing in the locality . . . as determined . . . (subsequent to a determination under applicable State . . . law) by . . . PHA." Section 507 defines a "substantial breach" of the contract as including action by an authority in violation of § 407 (H) by incurring "any operating expenditures . . . except pursuant to . . . an approved operating budget . . . or . . . total operating expenditures in excess of the amount therefor shown in an approved operating budget . . . ."

minations pursuant to . . . [§] 16 (2) . . . and on September 1, 1960, forwarded such determinations to the . . . authority. . . . The[se] wage rates . . . were predicated on the survey . . . . [T]he . . . authority paid its employees and is now paying its employees the wage rates determined by . . . [PHA] effective April 1, 1960.'' PHA has not adopted the wage rates determined by the commissioner. On December 2, 1960, PHA by circular letter ''cautioned'' all housing authorities in Massachusetts ''not to exceed'' the PHA wage rates.

The total increase in the authority's operating budgets due to the commissioner's wage determinations of October 26, 1960, and April 6, 1961, was $286,492. These determinations, in most instances, are higher than those made by PHA (see fn. 2, *supra*).[4] The authority has been receiving the maximum subsidy from PHA on projects aided by it and from the Commonwealth on projects aided by the State.[5] None of the authority's employees is ''engaged in the construction of public works as distinguished from the development or administration of housing projects.'' The basis of the commissioner's determinations[6] is discussed later in this opinion.

The authority contends that the commissioner's orders are void as to federally aided projects because (a) they impair the obligation of the authority's contract with PHA, (b) they invade a field which the authority says has been preëmpted by congressional legislation and administrative action, and (c) they seek to compel a breach by the author-

---

[4] It is stated in the authority's brief that PHA on August 21, 1962, issued a new schedule (see fn. 2, col. 4, *supra*) of maintenance wages, effective April 1, 1962. ''A rough calculation is that the annual payroll burden on the authority by reason of the [commissioner's] higher rates . . . as compared with PHA rates is $65,353 . . . a little more than 7/10% of the annual rents.''

[5] The authority also entered into a contract for financial assistance on certain projects with the Commonwealth. The State Housing Board approved a revision of the authority's then current budgets to include PHA's 1960 wage determinations. The authority on February 10, 1960, concluded an agreement on wages and other matters, adopting PHA's determinations as minima, with various labor organizations representing certain classes of its employees.

[6] The commissioner, before making his wage determinations, did not make a survey similar to that made by PHA.

ity of the contract with PHA. The authority also contends that the orders were arbitrary and capricious, especially in their application to janitors.

Because the case presented issues that might seriously affect PHA and also the State Housing Board, we caused inquiry to be made whether either body wished to intervene or to have counsel in its behalf file a brief as amicus curiae. Each agency disclaimed any such wish. The Department of Justice, however, in behalf of PHA, has filed a "statement of interest," in general asserting that a decision adverse to the position of the authority "might . . . seriously impair or defeat the accomplishment of . . . [the] objective" of furnishing low cost housing, found in the United States Housing Act of 1937 (42 U. S. C. §§ 1401–1435 [1958]) and in related State legislation. See G. L. c. 121, §§ 26I et seq., as amended.[7]

1. We interpret G. L. c. 121, § 26T, as amended in 1960 (see fn. 1, *supra*), as directing the commissioner to set wage rates of the several classifications of housing authority employees "at no less than eighty per cent" of the wage standard prescribed under G. L. c. 149, § 26 (see also § 27),[8]

---

[7] The statement of interest points out that increases in wage rates will result either (a) in increasing the Federal government's annual contributions, or (b) where contributions already are at the permissible maximum, will tend to increase tenants' rents "at the expense of the main objective of . . . [providing] adequate housing to the lowest income group at rents which they can afford." Its own surveys, PHA says, show that compliance with the commissioner's orders "would result in . . . wage rates . . . considerably in excess of those paid in any comparable activity in the locality and . . . in no sense 'prevailing.'" PHA then contends "that the 1960 amendment . . . imposed an additional arbitrary and burdensome requirement . . . not contemplated . . . when the . . . contributions contracts were entered into . . . . [B]oth the United States Housing Act and the . . . contract require . . . economy . . . in . . . development and administration . . . . Any proposal, therefore, that . . . [an] authority shall pay a higher wage than the [prevailing area] rate . . . raises the question of whether such increased payments would contravene . . . the act and the contract. . . . In the absence of special market conditions . . . the PHA view is that there can be no more justification for . . . [an] authority to expend public funds for . . . wages in excess of those prevailing in the area than there would be for payment for other goods or services in excess of the market price."

[8] Section 26 (as amended by St. 1960, c. 401, § 1) reads in part, ". . . The rate . . . of the wages paid to . . . mechanics, teamsters, chauffeurs and laborers in the construction of public works shall not be less than the rate . . . determined by the commissioner as hereinafter provided; provided, that the wages paid to laborers . . . shall not be less than those paid to laborers in the

relating to wages in public works construction. This minimum is to apply at least to each classification of housing authority employees for which there is any properly comparable classification of public works construction employees. We discuss later (part 5 of this opinion) the authority's contention that there is no close similarity, in respect of wages and working conditions (a) of janitors and maintenance workers in certain other classifications and (b) any class of construction employees.

2. The provision of the United States Housing Act of 1937 bearing most directly on wage rates in housing projects is 42 U. S. C. § 1416 (2) (1958).[9] This section seems to imply that, as to maintenance employees, the wage standards generally "prevailing in the locality" for such employees are to be applied, whereas, as to at least some classes of development employees, the local wage standards in the construction field (determined under the Davis-Bacon Act) are to govern. Section 1416 (2) directs PHA to determine wage standards "subsequent to a determination under applicable State . . . law," but does not seem to require that PHA be controlled by such State determination.

Section 1416 (2) prescribes only a minimum wage rate.

---

municipal service of the town . . . where said works are being constructed . . . provided, further, that if, in any of . . . [such] towns . . . wage rates have been established . . . by collective agreements . . . the . . . rates to be paid on said works shall not be less than . . . [such] rates . . . provided, further, that in towns where no such . . . rates have been so established, the wages paid . . . on public works, shall not be less than the wages paid to the employees in the same . . . occupations by private employers engaged in the construction industry. . . ."

[9] Section 1416 (2) reads, "Any contract for . . . annual contributions . . . shall contain a provision requiring that not less than the . . . wages prevailing in the locality, as determined . . . (subsequent to a determination under applicable State or local law) by . . . [PHA] shall be paid to all architects . . . engineers . . . and technicians, employed in the *development* and to all *maintenance* laborers and mechanics employed in the *administration* of the . . . project . . . and . . . also . . . that not less than the wages prevailing in the locality, as predetermined by the Secretary of Labor pursuant to the Davis-Bacon Act [40 U S. C. § 276 a (Supp. III, 1962)], shall be paid to all laborers and mechanics employed in the *development* of the project . . ." (emphasis supplied). The Davis-Bacon Act relates to wage rates under Federal contracts for the "construction, alteration . . . or repair . . . of public buildings or . . . works of the United States" and requires wage rates "determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar . . . in the city . . . in which the work is to be performed."

Another section (see 42 U. S. C. § 1415 [5] [Supp. III, 1962]), however, requires, in "order to insure that the low-rent character of . . . projects will be preserved, and that the other purposes of . . . [the act] will be achieved," that contributions contracts "provide that . . . [each] project shall be [so] undertaken . . . that . . . economy will be promoted both in construction and administration." This provision amply authorizes PHA to impose PHA budgetary supervision over each project aided by it as a condition of the grant of annual contributions. See for other provisions supporting such controls, 42 U. S. C. §§ 1410, 1415 (4), 1421a, and 1435 (1958, and Supp. III, 1962).

The State housing authority law (G. L. c. 121, § 26I et seq.) was enacted with full legislative cognizance of the United States Housing Act. See § 26J, as amended. Each authority has been authorized (§ 26P, as amended through St. 1961, c. 188, § 1) "to receive [Federal] loans, grants, and annual . . . contributions," to "co-operate with the federal government in any . . . project," and "to enter into . . . and carry out . . . contracts with the federal government." Section 26Y (as appearing in St. 1946, c. 574, § 1) provides that an "authority . . . with the written approval of the [State housing] board, and of the mayor of the city . . . in which the project is situated, may enter into agreements with the federal government relative to the acceptance . . . of funds for any low-rent housing project . . . ." There is thus very direct State legislative consent to the type of contract which the authority has made with PHA.

3. There seems to be conflict between (a) the commissioner's orders under § 26T and (b) the requirements of PHA, acting within the powers given to it by Congress. This conflict will become acute if PHA fails to approve revision by the authority of its present and future operating budgets to reflect the commissioner's wage rates.

It may be that the Legislature, by authorizing contracts with PHA, did not foreclose itself from all subsequent exer-

cise of the police power in the narrow sense of the "fundamental power to establish regulations necessary to secure the health, safety, good order, comfort, or general welfare of the community, defined 'with some strictness, so as not to include everything that might be enacted on grounds of mere expediency.' " See *Opinion of the Justices,* 341 Mass. 760, 783–786. Under § 26T, however, the commissioner has purported to order the authority substantially to increase its wage expense. If PHA does not approve the increased wage rates, the orders will then direct the authority to make expenditures in excess of those in an approved operating budget. See § 507 (2), fn. 3, *supra.* Such excess expenditures would be a "substantial breach" of the contributions contract, entitling PHA (see § 502) to demand possession of the projects and (§ 505) to operate them. (See also 42 U. S. C. § 1421a [1958].) If § 26T permits the commissioner thus to compel the authority to commit a "substantial breach" of a contract which the Legislature has authorized, the question at once arises whether § 26T, and the commissioner's orders under it, impair the obligation of the contract. See U. S. Const. art. 1, § 10, cl. 1.

Another constitutional question also may be presented. The Federal legislation already cited and proper PHA action under it cover comprehensively the whole field of such housing authority expenditures. If § 26T is applied to such projects, it will impinge sharply on an area which Federal action has largely preëmpted. It tends to thwart the Federal government's policy behind the contract under which a State instrumentality has accepted benefits. Cf. *Garner* v. *Teamsters, Chauffeurs & Helpers Local Union No. 776 (A. F. L.)* 346 U. S. 485, 490–491, 500–501; *Pennsylvania* v. *Nelson,* 350 U. S. 497, 502–510; *United States* v. *Chester,* 144 F. 2d 415, 420–421 (3d Cir.). Cf. also *Public Util. Commn. of Cal.* v. *United States,* 355 U. S. 534, 540–546; *Paul* v. *United States,* 371 U. S. 245, 252–263, modifying *United States* v. *Warne,* 190 F. Supp. 645, 654–657 (N. D. Cal.); *United States* v. *Georgia Pub. Serv. Commn.* 371 U. S. 285, 289–293.

If a "substantial breach" of the contract should take place and possession of the projects should pass to PHA, it could hardly be contended that PHA, during its operation of the projects, would be subject to the commissioner's wage rate orders. It is a Federal agency and would be performing a Federal function. The authority, acting under PHA supervision with the consent of the Legislature, is participating in the performance of the same Federal function. In practical aspect it stands in a similar position. Cf. *Schetter* v. *Housing Authy. of Erie,* 132 F. Supp. 149, 151–152 (W. D. Pa.).

These constitutional considerations bear strongly upon the construction of § 26T. Accordingly, so as to avoid serious constitutional doubts (see *Ferguson* v. *Commissioner of Corps. & Taxn.* 316 Mass. 318, 323–324; *Opinion of the Justices,* 341 Mass. 760, 785), we interpret § 26T as not intended by the Legislature to require action by the authority in conflict with proper explicit budgetary requirements of PHA. In the absence of much more definite statutory language, we should not regard § 26T, as amended, itself a part of the law which sanctions the PHA contract, as requiring the authority to commit a "substantial breach" of that contract. The intention to coerce such a head on conflict with Federal authority is not lightly to be attributed to the Legislature, which must be taken to have known the existing law relating to housing projects receiving PHA contributions. See *Gloucester Ice & Cold Storage Co.* v. *Assessors of Gloucester,* 337 Mass. 23, 33.

Section 26T, thus construed, requires the authority to include (by revision or initially) in its operating budgets estimated wage expenditures in accordance with any valid wage rate orders[10] of the commissioner, and to make payments accordingly if these budget items are approved by PHA. If PHA (also charged with the duty of protecting

---

[10] Neither party has adequately presented the question whether the orders were validly adopted under G. L. c. 30A, or whether c. 30A has application to the orders, although those matters were somewhat discussed at the arguments. See G. L. c. 30A, §§ 1 (2), 1 (5), 2, 3, and 7; *Allied Theatres of New England, Inc.* v. *Commissioner of Labor & Indus.* 338 Mass. 609, 611–612; *Kneeland Liquor, Inc.* v. *Alcoholic Beverages Control Commn., ante,* 228, 233–234. See also G. L. c. 149, § 9; *Treasurer of Worcester* v. *Department of Labor & Indus.* 327 Mass. 237, 239. We do not pass upon those questions.

labor, see fn. 9, *supra*) in fact disapproves authority expenditures budgeted in accordance with the commissioner's orders, such disapproval will relieve the authority of any necessity of compliance with the commissioner's orders under § 26T. Because of the contract the authority will not be entitled to make such expenditures until it obtains PHA approval. We assume, of course, that PHA, in passing upon authority budgets, will give all appropriate consideration to the commissioner's wage rate orders.

4. The potential conflict of the commissioner's orders with PHA's expenditure control over Federal aid projects has no relevance to these orders as applied to projects in which there is no Federal participation. The legislative expectation may have been that PHA would approve budgets based on the commissioner's wage rates. Nevertheless, there is no indication in § 26T that these rates were not to apply in projects where forcing their use would not conflict with Federal policy or improperly impair the obligation of an existing contract. See *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 336 Mass. 651, 656–658. The commissioner is entitled to have his orders, if otherwise valid, enforced by injunction as to projects concerning which no PHA contract is in effect.

5. The authority argues that "janitors" are not within the coverage of the 1960 amendments of § 26T, because the term "laborers and mechanics" as used in § 26T must be given the same meaning as those words when used in c. 149, §§ 26, 27, which are referred to in § 26T. We assume that a janitor is not a "mechanic" for present purposes. Whether a janitor is within the term "laborer" as used in § 26T and c. 149, § 26, is a more difficult question.

The record shows that there are no classifications in the construction industry comparable to those of janitor, fireman, junior development aide, senior development aide, and appliance man. It may be also that a "differential in favor of the construction or heavy-type laborer compared to the janitor or custodial-type worker is common practice among

. . . employers." The job descriptions of "janitor" and "building construction laborer" are different. Nevertheless, the commissioner (see fn. 2) set both the construction laborers' rate and the janitors' rate at $2.20 per hour. PHA, following its "comprehensive" wage "survey of the prevailing wage rates being paid by public and private employers in the . . . Boston" area, fixed the janitors' rate, effective April 1, 1960, at $1.93 and the construction laborers' rate at $2.07. The commissioner set rates in other categories either on the basis of the authority's job descriptions or, in the case of firemen, on the basis of eighty per cent of those in an existing labor contract.

We think that § 26T must be construed as authorizing the commissioner to set wage rates for all the lower paid employees of an authority, except as the contributions contract and PHA supervision of wage rates may preclude such action. We think also that the duties of a janitor involve sufficient manual and physical work to bring such an employee within the generic term "laborer" as used in § 26T. The absence of a category in the construction field comparable to that of a janitor does not of itself warrant the conclusion that § 26T was not intended to apply at all to janitors.

The Legislature has stated specifically that the commissioner is to set wage rates at "no less than eighty per cent of the prevailing wage" under c. 149, § 26. It was open to the Legislature to set this wage standard even though reference to a standard prevailing among maintenance workers might have been more in accordance with existing business practices. Accordingly, as to janitors, and also as to other classes of workers not found in the construction industry, the commissioner under § 26T may reasonably use a rate of eighty per cent of the prevailing wage rate of the most nearly comparable class of construction worker, giving due consideration to the differences and similarities in (a) skills required, (b) hazards undergone, (c) burdens, responsibilities, and physical effort undertaken, and (d) similar matters. On this record, we cannot say that the commissioner erred in setting the rates for janitors and for

other classes of maintenance workers not found in the construction industry.

6. The case is remanded to the Superior Court for further proceedings consistent with this opinion. Since the case has involved an initial interpretation of § 26T, as well as important questions of State-Federal relationships, it may be that amendment of the pleadings and further hearings will be appropriate to avoid further controversy between the parties. If so, the Superior Court may permit such amendments and hear the case further. In the absence of such amendments, a final decree is to be entered (1) declaring the rights of the parties in a manner consistent with this opinion, (2) directing the authority to include (a) in an application to PHA for revision of existing budgets and (b) in formulating any new budgets, estimated wage expenses based upon rates not less than those set forth in the commissioner's orders, and (3) enforcing the orders in projects not aided by PHA. Any decree may provide for the retention of jurisdiction to make any adjustments in the decree that may be necessitated by further action of PHA and to supervise the performance of the decree.

*So ordered.*