COMMISSIONER OF LABOR AND INDUSTRIES *vs.* LAWRENCE
HOUSING AUTHORITY & another [1]
(and a companion case [2]).

Suffolk. March 6, 1970. — August 12, 1970.

Present: WILKINS, C.J., SPALDING, KIRK, REARDON, & QUIRICO, JJ.

*Housing. Public Works. Jurisdiction,* Housing, Public works, Federal
field. *Labor.*

The authority given by the Legislature to local housing authorities to
coöperate with the Federal government in housing projects is suffi-
ciently broad to encompass the utilization of a procedure, known as
"turnkey housing," developed by the United States Department of
Housing and Urban Development for providing low-rent public hous-
ing. [209]
A local housing authority, in coöperating with the Federal government
in developing a "turnkey" low-rent housing project pursuant to G. L.
c. 121, § 26P (a), (b), acted as agent of the United States Department
of Housing and Urban Development in performing a Federal function.
[210]
The minimum wage provisions of G..L. c. 149, §§ 26–27D, and the com-
petitive bidding provisions of §§ 44A–44L, did not apply to a proposed
federally assisted low-rent housing project to be carried out in a city
by a developer, the local housing authority, and the United States
Department of Housing and Urban Development in accordance with
a procedure, known as "turnkey housing," developed by the de-
partment. [210–211]

TWO BILLS IN EQUITY filed in the Superior Court on
June 23, 1969.

The suits were heard by *Kalus,* J.

*Raymond F. O'Connell,* Special Assistant Attorney Gen-
eral, for the Commissioner of Labor and Industries, sub-
mitted a brief.

*Joseph M. Corwin (Sally A. Corwin & Wilbur A. Hyatt*
with him) for Wildor J. Barron & others.

---

[1] J. A. Leone Realty and Development Corporation.

[2] The companion case is Wildor J. Barron & others *vs.* Lawrence Housing
Authority & others.

*Lewis H. Weinstein* (*Philip Burling & Robert V. O'Sullivan* with him) for Lawrence Housing Authority; *Albert S. Previte, Jr., & John F. Burke,* for Lawrence Redevelopment Authority, and *Salvatore J. Basile,* for J. A. Leone Realty and Development Corporation, also with him.

*James P. Kane,* City Solicitor, for the City of Lawrence, joined in a brief.

*John W. Wright,* Special Assistant Attorney General, for the Department of Community Affairs of the Commonwealth, amicus curiae, submitted a brief.

*Herbert P. Gleason,* Corporation Counsel, and *Judith A. Wolf,* for the City of Boston, amicus curiae, submitted a brief.

KIRK, J. In the principal case, the Commissioner brought a bill in equity seeking injunctive and declaratory relief against the Lawrence Housing Authority and the J. A. Leone Realty and Development Corporation (Leone). He sought to restrain the housing authority and Leone from making or receiving "any payments for work performed in the construction of" a housing project known as Project Mass–10–7. He also requested a declaration that a letter of intent and contract of sale for the project constituted a contract for the construction of a building, and that such a contract was in violation of G. L. c. 149, §§ 44A–44L. The defendants by way of counterclaim sought declaratory relief.

The case was submitted to the judge on a statement of agreed facts and on other evidence. The judge made additional findings and rulings and entered a final decree dismissing the Commissioner's bill. On the defendants' counterclaim, the decree declared that "turnkey housing," the method of developing low-income housing used by the defendants, does not violate the minimum wage provisions of G. L. c. 149, §§ 26–27D, or the competitive bidding provisions of §§ 44A–44L.

In the companion case, eighteen taxpayers of the city of Lawrence brought a bill in equity, purportedly under G. L. c. 40, § 53, against the same defendants, as well as against

the city of Lawrence and the Lawrence Redevelopment Authority. The taxpayers' bill sought to restrain the performance of a "Cooperation Agreement" between the city and the housing authority, to restrain the city from expending any funds to carry out Project Mass–10–7, and to restrain the redevelopment authority from conveying certain land to Leone. The judge sustained the defendants' demurrer, allowed their pleas in abatement and in bar, and entered a final decree dismissing the bill.

The Commissioner and the taxpayers have appealed. Since the issue in both cases is the same, we need not review the interlocutory decrees in the taxpayers' case, but will decide both cases on the merits.

Both suits involve the implementation by the housing authority of a plan for the development, in connection with the United States Department of Housing and Urban Development (HUD), of a low-rent housing project. On January 20, 1969, the housing authority and HUD concluded an amendment (no. 7) to their "consolidated annual contributions contract." [3] Under the terms of the amendment, HUD agreed to assist the housing authority in acquiring and operating a low-rent housing project, designated as Project Mass–10–7, consisting of 105 dwelling units for the elderly. The housing authority was to acquire the project in accordance with a technique, known as "turnkey housing," developed by HUD for providing low-cost public housing. Under this technique, a developer who owns or has an option on an appropriate site retains his own architect to draw preliminary plans and specifications for the construction or rehabilitation of housing units. The plans are submitted to the local housing authority. If the proposal is acceptable to the housing authority and to HUD, the housing authority and the developer will execute a "letter of intent," which sets forth the plans and a cost estimate. If the parties agree on a price, the developer retains a registered architect to prepare detailed "working" plans and

---

[3] See 42 U. S. C. § 1410 (Supp. IV, 1965–1968). See also *Commissioner of Labor & Indus.* v. *Boston Housing Authy.* 345 Mass. 406, 409.

specifications. When these have been approved by HUD, the developer and the housing authority execute a contract of sale which contains provisions as to materials and the completion date, and in which the housing authority agrees to purchase the completed housing. HUD assures the availability of the purchase money upon completion of the project, and assures the developer that, if the housing authority should fail to carry out its contract obligations, HUD will assume the rights and obligations of the housing authority under the contract. The housing authority pays the developer upon completion of construction and the "turning over of the keys." See U. S. Department of Housing and Urban Development, Buying from Developers: A Guide to the "Turnkey" Method of Public Housing Construction, at pp. 4–6; Ledbetter, Public Housing — A Social Experiment Seeks Acceptance, 32 Law & Contemp. Prob. 490, 517–518; Burstein, New Techniques in Public Housing, 32 Law & Contemp. Prob. 528, 529–535. See also *Lehigh Constr. Co.* v. *Housing Authy. of Orange,* 56 N. J., 447, 450–457.

Pursuant to its contributions contract with HUD, the housing authority executed a letter of intent with Leone. Leone agreed to construct housing units, on property owned or to be acquired by Leone, in accordance with plans and specifications to be drawn by Leone and approved by the housing authority and HUD. The housing authority agreed to purchase the completed project if it complied with the approved plans and specifications.

1. The Commissioner was directed by former G. L. c. 121, § 26T (now substantially contained in G. L. c. 121B, §§ 12, 29, inserted by St. 1969, c. 751, § 1), to set wage rates in accordance with G. L. c. 149, §§ 26, 27, of the several classifications of persons, including architects and laborers, employed in "the development or administration of a project." See *Commissioner of Labor & Indus.* v. *Boston Housing Authy.* 345 Mass. 406, 411–412. By G. L. c. 149, § 44K, his department is charged with enforcing the provisions of §§ 44A–44L, which require competitive bidding for contracts to be awarded by governmental units "for the

construction, reconstruction, alteration, remodeling, repair
or demolition of any building" (§ 44A, as amended through
St. 1967, c. 535, § 1).

The Commissioner maintains that the housing authority's
letter of intent and proposed contract of sale with Leone
amount to a contract for the construction of a building by a
governmental unit within the meaning of G. L. c. 149,
§ 44A, and for the construction of public works within §§ 26,
27, and is also the "development" of a housing project
within the meaning of former G. L. c. 121, § 26T (see now
G. L. c. 121B, §§ 12, 29). On that basis the Commissioner
argues that the contract should have been awarded in ac-
cordance with the competitive bidding laws, c. 149, §§ 44A–
44L, and the wages of those engaged in the construction of
the project are to be determined by him in accordance with
c. 149, §§ 26, 27. The defendants on the other hand main-
tain that their agreement constitutes a contract for the
acquisition by the housing authority of a completed project
rather than for the construction of one, and they accordingly
argue that under former c. 121[4] as well as under the present
housing authority law, c. 121B,[5] acquisition contracts are
differentiated from construction contracts, so that the com-
petitive bidding and minimum wage provisions of c. 149 do
not apply to the type of transaction here involved.

The turnkey method of housing development is clearly
something more than the usual "acquisition" of realty and

---

[4] See G. L. c. 121, § 26P, as amended through St. 1955, c. 640, § 2, "A
housing authority . . . shall have the following powers in addition to others
specifically granted elsewhere in the Housing Authority Law . . . (b) . . . to
purchase . . . and hold, any property real or personal . . . found by it to
be necessary or reasonably required to carry out the purposes of the Housing
Authority Law . . . ; to engage in or contract for the construction . . . of
any clearance or housing project . . . ."

[5] In G. L. c. 121B, § 1, inserted by St. 1969, c. 751, § 1, a "low rent housing
project" is defined to include "(3) the purchase of, or acquisition, otherwise
than by eminent domain, of the right to use, completed dwelling units which
have been recently constructed . . . ." Section 11 provides that housing
authorities shall have the power "(d) . . . to purchase or lease . . . and
hold, any property, real or personal, or any interest therein, found by it to
be necessary or reasonably required to carry out the purposes of this chapter
. . . [and] (f) [t]o engage in or contract for the construction . . . of any
. . . housing . . . project . . . ."

buildings. Under this method, before construction commences, the housing authority reviews and approves the plans for the project and in general thereafter exercises more control over the developer than is customarily exercised by a prospective purchaser of land and buildings. The turnkey method is also unlike the usual "construction" project, in that under the turnkey method the developer, rather than the housing authority, initiates the basic design for the project and retains the architect and contractor. The completed project or "end product" is purchased by the housing authority only if the project meets its requirements.[6] We need not decide whether, in circumstances other than those of the instant case, an arrangement similar to the turnkey procedure would constitute a contract for the construction of a public building or public works. The cases may be more readily disposed of on another ground.

2. We are of opinion that, as the defendants also argue, the case is controlled by our decision in *Commissioner of Labor & Indus.* v. *Boston Housing Authy.* 345 Mass. 406. In that case a local housing authority, pursuant to the United States Housing Act (42 U. S. C. §§ 1401–1435 [1958], as amended, §§ 1401–1436 [Supp. III, 1962]), and the State housing authority law (former G. L. c. 121, §§ 26I et seq.), had entered into a "contributions contract" with the Federal Public Housing Administration (Federal Administration) prohibiting expenditures on the operation of a housing project in excess of an operating budget submitted to and approved by the Federal Administration. We held that local housing authorities had been authorized by G. L. c. 121, §§ 26P and 26Y, to make contracts and to coöperate with

---

[6] The turnkey method has been referred to as "the reverse of the standard method under which the housing agency first acquires the property by purchase or eminent domain, has the construction plans and specifications prepared by its own architects, and then has the construction done by general contractors. Under turnkey, a low-rent project can be constructed in less than half the time traditionally required for public housing. It frees the builder from complicated and cumbersome procedures and stimulates his initiative to develop imaginative and well-designed buildings at lower cost." Report of the House Committee on Banking and Currency, H. Rep. No. 1585, 90th Cong., 2d Sess., 2 U. S. Code Cong. & Adm. News 1968, 2873, 2899.

the Federal government in low-rent housing projects, and that the housing authority was not required to increase its wage expenditures to comply with the Commissioner's determination pursuant to c. 121, § 26T, and c. 149, §§ 26, 27, unless the increase (in view of housing authority's contract with the Federal Administration) was approved by that Administration.[7]

One of the grounds for our decision in the *Boston Housing Authy.* case was that "[t]he State housing authority law . . . was enacted with full legislative cognizance of the United States Housing Act," and there was "thus very direct State legislative consent to the type of contract which the authority" had made with the Federal Administration. 345 Mass. at 413. A construction of c. 121 permitting the Commissioner under § 26T to compel the housing authority to increase its expenditures would have caused the housing authority "to commit a 'substantial breach' of a contract which the Legislature . . . [had] authorized," and would raise the question "whether § 26T, and the commissioner's orders under it, impair the obligation of the contract. See U. S. Const. art. 1, § 10, cl. 1." *Id.* at 414.

It appears that the Federal government first announced its plan to utilize the turnkey procedure in the development of low-rent housing in 1966. See Burstein, *supra*, 32 Law & Contemp. Prob. at 529.

Regulations governing the procedure were promulgated under the broad rule-making power granted HUD by 42 U. S. C. § 1408 (Supp. IV 1965–1968), and now appear in HUD's publication entitled, Low-Rent Housing Turnkey Handbook.[8] It is clear that if a housing authority decides to develop a project by means of the turnkey method it must

---

[7] In § 29 of c. 121B, inserted by St. 1969, c. 751, § 1, housing authorities are now directed to furnish the Commissioner with a list of the classifications of work of various persons employed "[i]n the development or administration of a project *which is not federally aided* . . ." (emphasis supplied).

[8] This Handbook supersedes in relevant part the Low-Rent Housing Manual referred to in *Lehigh Constr. Co.* v. *Housing Authy. of Orange*, 56 N. J. 447, 450. It is mandatory in tenor, and therefore distinguishable from previous, merely advisory "handbooks" referred to in *Thorpe* v. *Housing Authy. of Durham*, 393 U. S. 268, 275.

comply with the requirements of the Handbook, in which no provision is made for competitive bidding, but which does contain HUD's own provisions regarding salaries or wages of those employed in the construction of a project.

The turnkey procedure obviously could not have been known to the Legislature at the time former c. 121 was enacted. Nevertheless, we think the authorization given local housing authorities in both former c. 121 and present c. 121B to coöperate with the Federal government is sufficiently broad to encompass the utilization of the turnkey procedure. Section 26P of c. 121, as appearing in St. 1946, c. 574, § 1, authorized local housing authorities "(a) . . . to receive loans, grants, and annual or other periodic contributions from the federal government," and "(b) . . . *to act as agent of*, or to co-operate with the federal government in any . . . housing project" (emphasis supplied). Substantially the same language appears in the present housing authority law, c. 121B, § 11 (c), (b), inserted by St. 1969, c. 751, § 1. See also former c. 121, § 26Y,[2] and the similar language now in c. 121B, § 11 (k). In its recent decision in *Lehigh Constr. Co.* v. *Housing Authy. of Orange*, 56 N. J. 447, 459–463, the Supreme Court of New Jersey held that the State housing authority law of New Jersey, enacted in 1938, was sufficiently broad to allow local authorities to engage in turnkey housing despite the terms of the State competitive bidding statute. The language of the New Jersey housing authority law is somewhat more explicit than the Massachusetts law with regard to obtaining Federal assistance.[10] Nevertheless, we think it is clear that the Legislature intended that local housing authorities be able to take advantage of any available Federal assistance in

---

[9] Section 26Y, as appearing in St. 1946, c. 574, § 1, provided that "[a] housing authority . . . may enter into agreements with the federal government relative to the acceptance or borrowing of funds for any low-rent housing project, or containing such other covenants, terms and conditions as the housing authority . . . may deem desirable. . . ."

[10] See e.g., N. J. Rev. St. Tit. 55, c. 14A, §§ 19, 43.

developing low-rent projects, including programs of Federal assistance not envisaged when c. 121 was enacted.[11]

Pursuant to legislative authorization, G. L. c. 121, § 26P (a), (b), and c. 121B, § 11 (c), (b), the housing authority in these cases is acting "as agent of" HUD in performing a Federal function. The Commissioner, therefore, has no more power to require the housing authority to comply with the competitive bidding and minimum wage laws than he would have were HUD itself contracting with Leone. *Boston Housing Authy.* case, *supra*, at 415.

The final decree in the pnricipal suit should not have dismissed the bill and is reversed. *Booker* v. *Woburn*, 325 Mass. 334, 336. *Foley* v. *Springfield*, 328 Mass. 59, 62–63. A new final decree is to be entered in that suit declaring on both the bill and the counterclaim that the minimum wage provisions of G. L. c. 149, §§ 26–27D, and the competitive bidding provisions of §§ 44A–44L do not apply to the

---

[11] The "Federal legislation" under which housing authorities were to co-öperate with the Federal government was defined in c. 121, § 26J, as amended through St. 1953, c. 647, § 10, as including the United States Housing Act of 1937, "any act in amendment thereof or in addition thereto, and *any other legislation of the Congress of the United States relating to federal assistance for . . . housing*" (emphasis supplied). In c. 121B, § 1, inserted by St. 1969, c. 751, § 1, "Federal legislation" is defined to include "any legislation of the Congress of the United States relating to federal assistance for urban renewal, clearance of substandard, decadent or blighted open areas, city or regional planning, . . . housing . . . *and any regulations authorized thereunder*" (emphasis supplied). Turnkey housing appears to have received Congressional recognition in § 2 of the United States Housing and Urban Development Act of 1968, 82 Stat. 476, which declared that in carrying out the goal of affording housing for low-income families, "there should be the fullest practicable utilization of the resources and capabilities of private enterprise . . . ." See also Report of the House Committee on Banking and Currency, H. Rep. No. 1585, 90th Cong., 2d Sess., 2 U. S. Code Cong. & Adm. News, 1968, 2873, 2899 (to accompany H. 17989).

Legislative concern for assuring that all available Federal funds be made use of is seen in the first sentence of G. L. c. 121, § 26NN, second paragraph, as appearing in St. 1948, c. 200, § 3, and now appearing in c. 121B, § 34, third paragraph, as amended through St. 1970, c. 359, § 2: "If federal assistance for low-rent housing becomes available in any form not applicable to projects under this chapter, the department shall immediately report the circumstances to the general court together with such recommendations for legislation as may be necessary to enable such projects to qualify for such assistance."

That the Legislature rejected a bill (House No. 5180 of 1969) which in § 2 would have expressly exempted the turnkey method of housing development from c. 149 does not demonstrate a contrary intent. Section 2 made no distinction between projects which are federally aided and those which are not.

federally assisted "turnkey housing" project involved in the suit. The interlocutory and final decrees in the taxpayers' suit are affirmed.

*So ordered.*