[Nos. 51398-8, 51399-6. En Banc. October 16, 1986.]

RICHARD DRAKE, *Appellant,* v. MOLVIK & OLSEN ELECTRIC, INC., ET AL, *Defendants,* SEATTLE HOUSING AUTHORITY, *Respondent.*

EDWARD HILLMAN, ET AL, *Appellants,* v. MOLVIK & OLSEN ELECTRIC, INC., ET AL, *Defendants,* SEATTLE HOUSING AUTHORITY, *Respondent.*

*Hugh Hafer, David Campbell,* and *Hafer, Price, Rinehart & Schwerin,* for appellants.

*Daniel W. Ferm* and *Copple, Ferm & Wade,* for respondent.

*Kenneth O. Eikenberry, Attorney General,* and *Mark J. Dynan* and *Barbara Gary, Assistants,* amici curiae for appellants.

BRACHTENBACH, J.—The question is whether a state statute, RCW 39.12, which mandates payment of prevailing wages on public works, applies to a federally funded construction project by the Seattle Housing Authority (SHA). The trial court granted summary judgment for the SHA. We reverse.

Resolution of the issue involves interpretation of several state statutes and possible federal preemption.

First, the factual setting. The SHA is a housing authority created pursuant to RCW 35.82. The SHA decided to build an apartment complex for low income elderly persons. The project was entirely funded by federal money administered by the United States Department of Housing and Urban

Development (HUD). 42 U.S.C. § 1437 *et seq.* Plaintiffs were employees of a subcontractor. They were paid less than the prevailing wages which would have been required by the state statute, RCW 39.12.

Now, the law. In 1945, the Legislature mandated that wages paid to laborers, workmen or mechanics *upon all public works* of the state, county, municipality or political subdivision shall not be less than the prevailing rate in the same trade or occupation in the locality. RCW 39.12.020. The statute provides a methodology for determination of the various elements of the prevailing wage rate, but these are matters not here in dispute. RCW 39.12.

■ The first issue is whether the SHA is within the scope of the prevailing wages statute. There is no doubt that a housing authority entity is within the statutory scope of the statutory scheme. RCW 39.04.010, dealing with public works, is so inclusive as to include every governmental body.

However, the triggering condition of the statute is that a public work exists only if the work is at "the cost of the state [or other covered entity] or which is by law a lien or charge on any property therein". RCW 39.04.010.

The SHA argues that since the project was totally funded by the federal government and the contractor and the subcontractor complied with the *federal* minimum wage law, cited hereafter, the state law does not apply. The federal law is the Davis–Bacon Act, 40 U.S.C. § 276a.

The clear answer is that the federal law provides that the wages shall not be *less* than those determined under the Davis–Bacon Act. 42 U.S.C. § 1437j (1978). It does not prohibit wages which are *more* than required by the Davis–Bacon Act.

In fact the contract between HUD and the SHA recognizes the very possible obligation to pay wages higher than required by the Davis–Bacon Act. The contract provides that if the contractor or any subcontractor finds it necessary to exceed the contracted wages, such excess shall not increase the contractual amount due. Thus the contractor

or the subcontractor and finally the SHA may have to pay more than the federally funded contract amount. That is a legislative problem, not one for judicial resolution.

To summarize to this point, we conclude that the SHA is within the ambit of the public works prevailing wage statute. The Legislature was very specific in a 1977 amendment when it stated "[a]ll public works . . . shall comply with . . . RCW 39.12.020." Laws of 1977, 1st Ex. Sess., ch. 177, § 1.

Our result is consistent with an opinion of the Attorney General on this precise issue. AGO 2 (1983). That analysis is correct and we incorporate it by reference. The source of funding does not determine the applicability of the prevailing wage statute. We recognize the practical difficulties of the conflict between federal funding and the consequences of the state wage law. However, that is a problem which must be solved by the Legislature and/or Congress.

The SHA concedes with candor that this is not a preemption issue so that question is not addressed.

We concur with the Attorney General who appeared as amicus curiae that the Davis–Bacon Act and the state statute serve a similar purpose, and both should be enforced. *United States v. Binghamton Constr. Co.,* 347 U.S. 171, 98 L. Ed. 594, 74 S. Ct. 438, *reh'g denied,* 347 U.S. 940, 98 L. Ed. 1089, 74 S. Ct. 625 (1954).

Reversed.

DOLLIVER, C.J., and UTTER, DORE, PEARSON, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.

CALLOW, J. (dissenting)—I would affirm the summary judgment in favor of the Seattle Housing Authority.

First, a further word on the background of the controversy. The Seattle Housing Authority was organized under RCW 35.82. It is the largest public housing authority in Washington State. It owns and operates more than 14,000 rental units in the city of Seattle for low income families, for senior citizens, and for handicapped persons. Most of

the rents it receives are subsidized by the United States Department of Housing and Urban Development (HUD). The operating and construction budgets of the Housing Authority are almost entirely funded by HUD. Most of the Housing Authority's units have been built or acquired during the past 40 years with federal funds administered under the United States Housing Act of 1937 as amended (42 U.S.C. § 1437 *et seq.*), under HUD regulations, and under an annual contributions contract between the Housing Authority and HUD.

In October 1981 the Housing Authority commenced work on Ross Manor, a 12–story apartment building for low income elderly persons. This project was developed entirely with federal funds administered by HUD. HUD paid for the design, site acquisition and construction of the building and the Housing Authority developed plans and specifications for the project using money advanced by HUD. HUD reviewed and approved the plans and established a budget for the Housing Authority for completion of the building. The Ross Manor budget was based on HUD imposed "prototype costs" limitations. After approval by HUD of the bid and construction documents, the Housing Authority sought public bids from general contractors. The bid solicitation documents were drafted or approved by HUD. HUD approved the construction contract ultimately awarded to the general contractor.

HUD required the Housing Authority to include among the contract terms the provision requiring that all workers be paid "not less than the wages prevailing in the locality . . . as predetermined by the Secretary of Labor pursuant to the Davis Bacon Act [40 U.S.C. §§ 276–276a–5] . . ." Neither the bid solicitation package nor the construction contract referred to State prevailing rates established by the Department of Labor and Industries. The subcontract with Molvik & Olsen required compliance with the Davis–Bacon Act provisions (40 U.S.C. § 276a) but did not require compliance with the State statutes. The Housing Authority did not require the statement of intent or the affidavit

described in RCW 39.12.040.

It is apparent that HUD policy prohibited state housing authorities from requiring payment of workers at state prevailing wage rates which exceeded the Davis–Bacon scales. HUD would not have allowed the Housing Authority to construct Ross Manor with federal funds if the Housing Authority's contract with the contractor had required payment of wages at the higher State–established prevailing rates.

When the plaintiffs worked at Ross Manor as electricians, the State prevailing wage rate was higher than the Davis–Bacon rate. They sued the Housing Authority for the difference claiming under RCW 39.12.042.

The State Housing Authority Law was enacted in 1939. The initial preamble to the chapter was amended in 1965 and the finding and declaration of necessity now codified as RCW 35.82.010 reads:

It is hereby declared: (1) that there exist in the state insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the state there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded and congested dwelling accommodations; that the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (2) that these areas in the state cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as herein defined) would therefore not be competitive with private enterprise; (3) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions

exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern; (4) that it is in the public interest that work on projects for such purposes be commenced as soon as possible in order to relieve unemployment which now (1939) constitutes an emergency; and the necessity in the public interest for the provisions hereinafter enacted, is hereby declared as a matter of legislative determination.

Under the legislative scheme which created housing authorities, they are to act independent of, but in cooperation with, the cities and counties which they serve. They are also to act in cooperation with the federal government since they are to provide housing for those persons and families of low income without any assistance from the State, the county or the cities wherein they operate. RCW 35.82.200 states as follows:

In addition to the powers conferred upon an authority by other provisions of this chapter, an authority is empowered to borrow money or accept contributions, grants or other financial assistance from the federal government for or in aid of any housing project within its area of operation, to take over or lease or manage any housing project or undertaking constructed or owned by the federal government, and to these ends, to comply with such conditions and enter into such mortgages, trust indentures, leases or agreements as may be necessary, convenient or desirable. It is the purpose and intent of this chapter to authorize every authority to do any and all things necessary or desirable to secure the financial aid or cooperation of the federal government in the undertaking, construction, maintenance or operation of any housing project by such authority.

This State statutory policy functions in conjunction with and is complementary to the federal policy expressed in 42 U.S.C. § 1437 which reads:

It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several

States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income and, consistent with the objectives of this chapter, to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs.

The pervasive control of the expenditure of funds made available to public housing agencies by the Secretary of Housing and Urban Development is apparent from a reading of 42 U.S.C. § 1437a through 1437g. Under 42 U.S.C. § 1437a(c)(3) "acquisition cost" is defined as "the amount prudently required to be expended by a public housing agency in acquiring property for a low–income housing project."

HUD has each year entered into an annual contribution contract with the Seattle Housing Authority whose operating and construction budgets are funded by federal low income housing funds administered by HUD. Under 24 C.F.R. § 841.503(a), the Housing Authority was required to develop projects "at the lowest possible cost." These requirements were carried over into the annual contributions contract in effect at the time of the construction of Ross Manor. HUD required the construction contract for Ross Manor to be submitted to it for its approval and had the approval not been given then the funds for the project would not have been forthcoming. The annual contribution contract entered into with the Housing Authority required the Davis–Bacon prevailing wage to be paid and included in the Ross Manor construction contract. The annual contribution contract stated that it would have been a substantial breach of the contract had the Housing Authority paid anything but the Davis–Bacon prevailing wage, thereby violating the limitation in the cost of construction for the project.

The scheme of the legislation as set forth in the statutory policies is to provide the maximum amount of low cost housing throughout the country, to achieve the maximum

number of housing units from the total federal funds available, to provide as much employment as possible, and to see that fair and reasonable wages are paid as defined by the federal Davis–Bacon Act.

This conflict between state and federal wage policy and the controlling federal authority was recognized in *Commissioner of Labor & Indus. v. Boston Housing Auth.*, 345 Mass. 406, 188 N.E.2d 150 (1963). Commenting on that case and the preeminence of the HUD policy and regulations, it was stated in *Northgate Constr. Co. v. State Tax Comm'n*, 377 Mass. 205, 207, 385 N.E.2d 967, 969 (1979):

> We have had occasion to recognize restrictions on State legislation in the face of clear contrary Federal policy in the field of public housing. In *Commissioner of Labor & Indus. v. Boston Hous. Auth.*, 345 Mass. 406 [188 N.E.2d 150] (1963), we held that the wage rates set for housing authority employees by the Commissioner of Labor and Industries under G. L. c. 121, § 26T, as then amended, could not be paid without prior approval of the Federal Public Housing Administration (PHA). We construed § 26T so as to avoid any conflict with the explicit budgetary requirements contained in the contract between the PHA and the Boston Housing Authority. 345 Mass. at 415–416. In *Commissioner of Labor & Indus. v. Lawrence Hous. Auth.*, 358 Mass. 202 [261 N.E.2d 331] (1970), we held that the procedures used in turnkey housing did not violate the Commonwealth's minimum wage law or statutory provisions concerning competitive bidding. We concluded that the Legislature intended that local housing authorities should be able to take advantage of available Federal assistance in developing low-rent projects.

I find *Local 497, IBEW v. PUD 2*, 103 Wn.2d 786, 698 P.2d 1056 (1985) to be inapplicable to the situation before us in light of the clear intent of the Washington Legislature under the State statutes to make it the obligation of local housing authorities to comply with the requirements of HUD to secure federal funding for the construction of housing projects. *Local 497, IBEW v. PUD 2, supra,* did not involve any such legislative policy regarding the acqui-

sition of federal funds, but rather the conflict was between two State statutes, the public utility districts statute which had directed local PUD's to set prevailing wage rates for their own projects and the provisions of RCW 39.12 relating to prevailing wages on public works.

Further, when the federal and state statutes are read together, I believe the statement from *Commissioner of Labor & Indus. v. Boston Housing Auth., supra* at 415, to be especially apropos. The prevailing wage statute was interpreted

> as not intended by the Legislature to require action by the authority in conflict with proper explicit budgetary requirements of PHA. In the absence of much more definite statutory language, we should not regard [the state prevailing wage statute] . . . as requiring the authority to commit a "substantial breach" of [the annual contribution contract]. The intention to coerce such a head on conflict with Federal authority is not lightly to be attributed to the Legislature, which must be taken to have known the existing law relating to housing projects receiving [HUD] contributions.

Was Ross Manor a public work? I think not. RCW 39.04.010 defines "public work" as construction done at the cost of the State or a municipality. Here Ross Manor was built entirely with federal funds. Under such a situation, state statutes do not require payment of state prevailing wages in conflict with the provisions of 42 U.S.C. § 1437 *et seq.*

Further, federal law preempts state regulation in this area. If both federal and state prevailing wage laws appear to apply to a single government construction project, federal standards must preempt the state regulations if they are antagonistic to the aim of the federal scheme. This preemption is mandated by law and federal housing policy.

It is the position of the majority that a state statutory prohibition of payment of state prevailing wages must exist to preclude payment under the state schedule even if the project is built entirely with federal funds. Ross Manor is built entirely with federal funds. The intent of the Con-

gress cannot be ignored.

The majority posits that RCW 39.12.020 supports the conclusion that state law prevails. Under RCW 39.12.020 the prevailing rates of wages are to be paid upon all public works of the *"state, or any county, municipality,* or *political subdivision."* (Italics mine.) RCW 39.12.020. I agree that these rates would and should be paid if this was a project of the enumerated state political units, but, as conceded, this project was funded entirely with federal funds. Further, the statute enumerates the state political subdivisions in descending order and the federal government as a political entity is not mentioned. Had the federal government been included within the Legislature's cognizance, it would have been listed before the state and its political subdivisions.

RCW 35.82.200 states:

It is the purpose and intent of this chapter to authorize every authority *to do any and all things* necessary or desirable to secure the financial aid or cooperation of the federal government in the undertaking, construction, maintenance or operation of *any housing project* by such authority.

(Italics mine.) The majority ignores the import and purpose of that statute. The relevant regulatory language sets forth the government policy that public housing agencies shall complete development at the "lowest possible cost." 24 C.F.R. § 941.530(a) (1985). In line with these regulations, the Seattle Housing Authority asserts that the principal purpose of the Housing Authority law is to promote the ability of counties and municipalities to obtain federal housing funds, to construct housing for as many low income persons as possible, to provide employment for as many workers as possible and to do this in as many localities across the nation as can be done with the available funds. I agree with the Seattle Housing Authority that this is the Congressional purpose. These housing funds will not spread as far if the overhead is inflated. This will adversely affect the housing authorities' efforts to complete development at

the "lowest possible cost". 24 C.F.R. § 941.503(a) (1985).

Reference to the policy of construction at the "lowest possible cost" has been stated in many publications:

> In 1970, Congress amended the United States Housing Act of 1937 to encourage the development of . . . housing for the elderly . . .

C. Edson & B. Lane, *A Practical Guide to Low– and Moderate–Income Housing* 6:6 (1972). Congressional publications have also spoken out on this matter:

> Among the objectives of federal housing policy are . . . alleviating excessive housing costs . . . providing housing for individuals with special needs due to age or disability.

Congressional Budget Office, *Federal Housing Policy: Problems and Recurring Issues* ix (1978). The elderly and the disabled are not the only concerns of the government:

> Housing assistance for low and moderate income is a major component of the federal government's overall housing and community development policy.

Congressional Budget Office, *Housing Assistance of Low– and Moderate–Income Families* ix (1977). The Congressional Budget Office elaborates further:

> Federal housing assistance policy for low– and moderate–income households has developed primarily around two major goals: To enable low– and moderate–income families to occupy and afford housing that is decent, safe and sanitary; and to encourage a stable high level of housing construction and construction employment.

*Housing Assistance for Low– and Moderate–Income Families, supra.*

Therefore the major policy goals of the federal government are to provide the maximum amount of low cost housing throughout the country for the elderly, those with low incomes and the disabled; and to achieve the maximum number of housing units from the total federal funds available, and to provide as much employment as possible. In line with these policy considerations is the requirement that fair and reasonable wages are paid as defined by the federal Davis–Bacon Act. 40 U.S.C. § 276a (1969).

Ross Manor is a federal government project that falls within the ambit of these government policies because the Ross Manor apartment complex was developed for the low income elderly. These policies will be met if the prevailing wage rates set forth in the Davis–Bacon Act are paid.

The Davis–Bacon Act is interrelated to the United States Housing Act. The United States Housing Act carries over the Davis–Bacon Act's technique of setting the wage rates. 42 U.S.C. § 1437j reads in part:

> Any contract for loans, annual contributions . . . shall also contain a provision that not less than the wages prevailing in the locality, as predetermined by the Secretary of Labor pursuant to the Davis–Bacon Act . . ., shall be paid to all laborers and mechanics employed in the development of the project involved (including a project with nine or more units assisted under section 1437f of this title, where the public housing agency or the Secretary and the builder or sponsor enter into an agreement for such use before construction or rehabilitation is commenced), and the Secretary shall require certification as to compliance with the provisions of this section prior to making any payment under such contract.

The Secretary identified the United States Housing Act as a "Davis–Bacon" related act and in *Glenn Elec. Co. v. Donovan,* 755 F.2d 1028, 1030–33 (3d Cir. 1985) it was stated:

> As we construe the plain wording of this section, the U.S. Housing Act incorporates by reference only the prevailing wage requirements as determined by the Secretary of Labor, in accordance with the Davis–Bacon Act, to be prevailing for the corresponding classes of laborers and mechanics employed on a project similar to the contract work being performed in the locality. . . .
>
> . . .
> . . . The Davis–Bacon Act makes it mandatory for "every contract in excess of $2,000, to which the United States or the District of Columbia is a party, for construction, alteration and/or repair . . . of public buildings or public works" to contain provisions for the payment of stated minimum wages to mechanics and laborers. 40 U.S.C. § 276a.

29 C.F.R. Part 5, Subpart A is entitled "Davis–Bacon and Related Acts Provisions and Procedures" and lists the 60-odd federal statutes which are euphemistically termed the "Related Acts" in 29 C.F.R. § 5.1(a) (1983). As the Secretary notes, the enumerated provisions . . . are deemed "related" in that they concern the enforcement and administration of Davis–Bacon's prevailing wage provisions; they require payment of minimum wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor pursuant to the Davis–Bacon Act. This comports with our construction of 42 U.S.C. § 1437j.

I submit 42 U.S.C. § 1437j does not set only a floor below which wages may not be paid but also sets forth that the determination of the wage rates to be paid shall be by the "Secretary of Labor pursuant to the Davis–Bacon Act."

The question that must be addressed is whether the Davis–Bacon Act preempts RCW 39.12 when the project is entirely financed with federal funds. The majority position is that there is no federal preemption. I believe there is.

Federal law may pre-empt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when the state law *"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*

(Citations omitted. Italics mine.) *Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd.,* 467 U.S. 461, 469, 81 L. Ed. 2d 399, 104 S. Ct. 2518 (1984). Here Congress has not explicitly defined the extent to which it intends to preempt state law. Nor has Congress indicated an intent to occupy the entire field of labor and/or housing.

The third possibility applies, however, because Congress has not displaced state regulation en toto. As the rule states, Congress has preempted state law in conflict with the acts of Congress if it is impossible to comply with both state and federal law or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Michigan Canners,* at 469. I submit that the application of the State law would frustrate the objectives of Congress. The Davis–Bacon Act must prevail.

In *Vaca v. Sipes,* 386 U.S. 171, 180–81, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967) it was stated:

A primary justification for the pre–emption doctrine [is] the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose . . .

*See also Local 926, Int'l Union of Operating Eng'rs v. Jones,* 460 U.S. 669, 680, 75 L. Ed. 2d 368, 103 S. Ct. 1453 (1983). *Vaca* was speaking of the National Labor Relations Board, but its statement applies equally to the Department of Labor.

The majority contends that the Davis–Bacon Act provides wages shall not be less than those predetermined by the act, but it does not prohibit wages which are more than those required by the act. It is easy to envision the disarray that federal policy would be in if the states are able to usurp national authority by setting 50 different rates at which federal funds will be paid. The results of the majority as I see it will be less housing for the elderly, the disabled and those on low incomes and less overall employment of construction workers. The Secretary of Labor has already made a determination of the prevailing wage for our area. It should be followed. The Secretary of Labor's decisions are authoritative. *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 761, 67 L. Ed. 2d 662, 101 S. Ct. 1451 (1981). *See North Ga. Bldg. & Constr. Trades Coun. v. Goldschmidt,* 621 F.2d 697, 704, 53 A.L.R. Fed. 248 (5th

Cir. 1980).

The whole wage determination process is exclusively within the jurisdiction of the Secretary of Labor and the correctness of his determination of wage rates is not subject to judicial review. *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 177, 98 L. Ed. 594, 74 S. Ct. 438 (1954). *See also Framlau Corp. v. Dembling*, 360 F. Supp. 806, 809 (E.D. Pa. 1973); *Virginia ex rel. Commissioner, Dep't of Hwys. & Transp. v. Marshall*, 599 F.2d 588, 592 (4th Cir. 1979). The federal government can legitimately preempt RCW 39.12 to the extent that it stands as an obstacle to the accomplishment and execution of housing law as expressed by Congress.

> Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state.

*Mayo v. United States*, 319 U.S. 441, 445, 87 L. Ed. 1504, 63 S. Ct. 1137, 147 A.L.R. 761, *reh'g denied*, 320 U.S. 810 (1943).

It is difficult to define the exact boundaries of the federal preemption of RCW 39.12 by the Davis–Bacon Act. "[T]he areas that have been pre–empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds." *San Diego Bldg. Trades Coun. v. Garmon*, 359 U.S. 236, 240, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959) (quoting *Weber v. Anheuser–Busch, Inc.*, 348 U.S. 468, 480–81, 99 L. Ed. 546, 75 S. Ct. 480 (1955)). Although *Garmon* speaks of the National Labor Relations Board, its rationale also holds true to the Department of Labor: "[T]he unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency . . ." *Garmon*, at 242. *Garmon* continues by stating:

> Congress evidently considered that centralized adminis-
> tration of specially designed procedures was necessary to

obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies.

*Garmon,* at 242 (quoting *Garner v. Teamsters, Local 776,* 346 U.S. 485, 490–91, 98 L. Ed. 228, 74 S. Ct. 161 (1953)). This is the problem which the majority decision may exacerbate. If it prevails, the result may be a race by the various states to exceed each other to the ultimate detriment of all.

The federal prevailing wage is an important part of all federal construction contracts:

> The Labor Standards Provisions and the Department of Labor wage determinations are statutory requirements for *all* construction, repair and rehabilitation contracts for federal public buildings in amounts over $2000.

(Italics mine.) *BUI Constr. Co. & Bldg. Supply,* 84–1 B.C.A. ¶ 17,183, at 85,578 (Armed Servs. 1984). Ross Manor is within these guidelines.

> [T]he Davis–Bacon Act and its regulations apply to a project which federal agencies and the builder anticipate will receive federal funding[.]

*North Ga. Bldg. & Constr. Trades,* at 701. Here the project was entirely paid for with federal funds. Even when these rates are omitted, they are viewed as being so fundamental that they are read into the contract. *See BUI.*

RCW 39.12 prevailing wage rates cannot be written into the contract. The Davis–Bacon rates were included, while no reference was made to any sort of state determination. "If both the state and federal prevailing wage laws appear to apply to a single government construction project, the federal standards will preempt the state regulations and laws." *See* D. Groff, B. Babbitt & W. Squires, *Washington Construction Law* 259 (5th ed. 1985). This result is the only logical result if the important housing policies previously discussed are to prosper and survive.

> To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. . . .

Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

*Garmon,* at 244.

Our oath and our responsibility is to uphold the laws of our country as well as those of our state. When an irreconcilable conflict exists between the two, the laws of the nation must prevail. Summary judgment was proper. I would affirm the trial court.

Reconsideration denied December 8, 1986.