[No. 30190-7-III.    Division Three.    December 6, 2012.]

SKYLINE CONTRACTORS, INC., *Appellant*, v. SPOKANE HOUSING AUTHORITY, *Respondent*.

194

*Kevin W. Roberts* (of *Dunn & Black PS*), for appellant.

*John H. Guin* (of *Law Office of John H. Guin PLLC*), for respondent.

¶1 SIDDOWAY, J. — The Spokane Housing Authority awarded a public works contract to Skyline Contractors Inc. but then refused to execute its owner-contractor agreement with Skyline and withdrew acceptance of its bid after Skyline failed to produce documentation of its subcontractor arrangements. The parties dispute whether a contract arose from the award and whether Skyline can pursue a claim for monetary damages for its breach.

¶2 Under well-settled principles of law, contractual obligations arose when the housing authority conveyed its written award of the contract to Skyline. But equally well-settled policy protecting taxpayers from the cost of disputes over such awards compels the conclusion that Skyline's exclusive remedy was to enjoin the housing authority's entry into an agreement with another bidder—a remedy it did not pursue. We affirm the trial court's summary judgment dismissal of Skyline's claim for damages.

## FACTS AND PROCEDURAL BACKGROUND

¶3 In February 2010, the Spokane Housing Authority issued an invitation for bids for a federally funded project to furnish and install windows on 75 homes or duplexes. The invitation for bids included, as a quality assurance contract specification, that the installer of the new windows specialize in performing such work, with a "minimum five years of documented experience." Clerk's Papers (CP) at 151.

¶4 Among the information required to be submitted with a bid was a "Bidder's Qualification and Subcontractor's List," on which the bidder was to identify its experience, the portions of the work that the bidder would self perform, the portions of the work that would be performed by subcontractors, and the name and qualifications of each subcontractor. The form stated that if the bidder intended to use subcontractors on the project, "you must show the name of the subcontractor WITH the Bid." CP at 87. In executing the Bidder's Qualification and Subcontractor's List, the bidder was required to certify that the information contained "is accurate, complete and current." *Id.*

¶5 Skyline submitted a timely bid. It disclosed on its Bidder's Qualification and Subcontractor's List that it had been in business for only 3 years as Skyline, but that its key personnel had 20 years of experience. It represented that it would perform 30 to 70 percent of the work and would use one subcontractor, McVay Brothers, who had 21 years of experience in window and door installation.

¶6 Skyline submitted the lowest bid, but the housing authority determined it was not a responsible bidder based on its less-than-five years of experience in window installation. On March 22, it notified all of the bidders that "[a]fter reviewing all of the submitted bids, we have determined that WRS Contractors Inc.[,] DBA Window Replacement System[,] shall be awarded the contract." CP at 196.

¶7 Skyline protested the award the next day. Although it had not yet been able to determine why its bid was rejected, it pointed out that in addition to its own experience, "we provided McVay Brothers as an additional installation company that also qualifies us under your guidelines." CP at 200.

¶8 It soon learned from housing authority representatives that its bid was rejected on the basis of its less-than-five years of experience. Armed with that information, it supplemented its protest, arguing that the quality assurance specification section "specifically calls for the installer

to have 'five years documented experience'" and "[w]e submitted not only [Skyline's] proof of experience, but also the 20+ years of experience from our subcontractor McVay Windows." CP at 205 (emphasis omitted).

¶9 Skyline asked in its protest that the housing authority reevaluate its bid, which the housing authority did. As part of its reevaluation, the housing authority asked for three items of additional information: first, a specific clarification of the percentage of work Skyline would perform; second, the type of work that Skyline would perform; and third, "[i]f Skyline is performing installation related work please provide 5 years of experience. You may not serve as your own reference." CP at 212.

¶10 In its response, Skyline stated that it "has full intention of subcontracting all installation of the windows as stated in the bid documents." CP at 215. In response to the third request for clarification, concerning the installation work, it stated, "Skyline, as stated above, does not intend to self perform installation of the windows. All contract documents will be followed as they were bid." *Id.* The response did not suggest any modification or addition to its earlier identification of McVay Brothers as its sole subcontractor.

¶11 After considering the further information, the housing authority treated Skyline's bid as responsive and on March 29 it notified Skyline that it "shall be awarded the contract" and that a preconstruction meeting would be held on April 12. CP at 218. The instructions to bidders had stated that a "written award shall be furnished to the successful bidder within the period for acceptance specified in the bid and shall result in a binding contract without further action by either party." CP at 45 (United States Department of Housing and Urban Development Form 5369, § 8(g)). The invitation for bids had provided that the form of agreement between the housing authority and the contractor would be on a form furnished by the housing authority; elsewhere, the housing authority's minutes and

communications refer to the form of agreement to be signed as its "Owner-Contractor Agreement." CP at 38, 220.

¶12 Disagreements and misunderstandings arose shortly after the housing authority notified Skyline of the award. We recap only the principal dispute.

¶13 At the preconstruction meeting held on April 12, discussion touched on Skyline's use of subcontractors. Minutes of the meeting prepared by representatives of the housing authority characterized Skyline's representatives as reporting that "[Skyline] had not finalized subcontractors at this time, and may not be using the listed subcontractor per the bid proposal." CP at 220.

¶14 The housing authority followed up shortly thereafter with notice to Skyline that "a formal request is required to modify your bid in order to change any listed subcontractor or add any additional subcontractor." CP at 485. Steve Spady, Skyline's senior project manager, immediately objected that "[a]ny discussions about other subs / workers e[tc]. was and is only discussions in case McVay can't or chooses not to perform," and asked for correction of the meeting minutes. *Id.* at 484. Mr. Spady later testified that Skyline was seeking approval of additional contractors only for risk management reasons, out of concern that the bid process had already delayed commencement of work and McVay Brothers might not be able to provide enough labor to complete the work on schedule.

¶15 Whatever the reason for Skyline's request for approval of other subcontractors, the housing authority, expressing concern at the deviation from Skyline's bid, demanded that Skyline produce a copy of its subcontract with McVay Brothers and with any other proposed subcontractor, asserting that submission of all subcontracts with listed subcontractors was a condition precedent to formation of a contract.[1] It notified Skyline that it would not execute its

---

[1] It relied upon article 2.3 of the as-yet unexecuted owner-contractor agreement, which provides:

owner-contractor agreement with Skyline until signed subcontracts were provided and accepted. In response to Skyline's objection that it could not secure subcontracts without a signed owner-contractor agreement, the housing authority stated it would accept subcontracts that were contingent upon its and Skyline's execution of that agreement.

¶16 At a second preconstruction meeting held on May 5, Skyline reported that it had secured four signed subcontracts and was seeking another three, to present to the housing authority as a package. According to meeting minutes, Skyline's spokesman at the meeting said that the McVay Brothers' subcontract "was in the group of three still to be resolved" and that in his experience, "listing subcontractors on a bid proposal did not mean he had to use the listed subcontractors." CP at 236.

¶17 Rather than await the projected package of seven subcontracts, the housing authority's lawyer notified Skyline later that day that the housing authority had "determined that Skyline is not a responsible bidder for this project and that its bid was not responsive to the invitation for bids" and it "reject[ed] Skyline's bid for the project." CP at 238. On May 12, the housing authority provided Skyline with a more detailed explanation of the basis for rescinding its award and rejecting Skyline's bid.

¶18 Skyline commenced an action for damages and injunctive relief the next day. It filed a contemporaneous motion for a temporary restraining order, which was heard in the ex parte department on the day filed and was orally granted, subject to Skyline posting appropriate security.

¶19 Skyline chose not to post the required security. The housing authority proceeded to award the contract to WRS,

---

This contract is contingent on the Contractor providing any and all necessary Subcontractor contracts with Subcontractor(s) as listed on the Bidder's Qualification and Subcontractor's List (SHA-P23). Subcontractor contracts shall be submitted for review and approval by Spokane Housing Authority within 5 business days of receipt of notification.
CP at 496.

and Skyline did not seek to enjoin execution of an agreement by WRS and the housing authority. The housing authority signed its owner-contractor agreement with WRS on June 1, 2010.

¶20 In March 2011, the housing authority moved for summary judgment dismissing Skyline's remaining claim for damages. The trial court granted the motion and awarded attorney fees and costs to the housing authority. Skyline appeals.

## ANALYSIS

¶21 Skyline raises two issues on appeal. It argues first that its bid was an offer, that the housing authority's award constituted acceptance, and that the trial court erred in finding as a matter of law that the written award was not a binding acceptance. It argues in the alternative that at a minimum, there were issues of fact whether a contract was formed and summary judgment was therefore improperly granted.

¶22 Summary judgment will be upheld if the pleadings, affidavits, answers to interrogatories, admissions, and depositions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends. *Greater Harbor 2000 v. City of Seattle*, 132 Wn.2d 267, 279, 937 P.2d 1082 (1997). We may affirm summary judgment on any theory established and supported by the moving party, even if it is not the basis relied upon by the trial court. *See LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989) (summary judgment may be granted even on a basis not considered by the trial court, so long as it is "established by the pleadings and supported by the proof").

¶23 Here, the facts in dispute do not present an issue of material fact. The parties presumptively had mutual contractual responsibilities upon the award of the contract. But

summary judgment was nonetheless appropriate because Skyline did not pursue its exclusive remedy of injunction. We address these disputed legal issues in turn.

I

¶24 The housing authority is a "public body corporate and politic, exercising public and essential governmental functions," and a "governmental body" as broadly defined within Title 39 RCW, dealing with public works. RCW 35.82.070; RCW 39.04.010; *Drake v. Molvik & Olsen Elec., Inc.*, 107 Wn.2d 26, 28, 726 P.2d 1238 (1986). The window replacement project at issue here is a "public work" within the scope and meaning of Title 39 RCW, even though federal funds were to be used for the construction. *Drake*, 107 Wn.2d at 29 (incorporating the reasoning of 1983 Op. Att'y Gen. No. 2, 1983 WL 162400, 1983 Wash. AG LEXIS 65). Skyline does not dispute that the housing authority was required to let the window purchase and installation contract through competitive bidding.

¶25 Washington cases, consistent with the weight of authority, have long recognized special principles that apply to the formation and enforcement of competitively bid contracts for public works. Judicially stated public policy affects contract principles in two respects that apply to the parties' dispute.

¶26 First, the governmental body's invitation for bids for a public works contract is not an offer that a bidder has the power to accept through a responsive bid; it is, instead, the solicitation of an offer. *Mottner v. Town of Mercer Island*, 75 Wn.2d 575, 578, 452 P.2d 750 (1969). A public contract awarded pursuant to competitive bidding procedures must be substantially in accordance with the terms of the invitation to bid. *Platt Elec. Supply, Inc. v. City of Seattle*, 16 Wn. App. 265, 277, 555 P.2d 421 (1976); 10 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 29.65, at 452 (3d rev. ed. 1999). Yet it is the bid for a public

works contract that constitutes an offer to contract. *J.J. Welcome & Sons Constr. Co. v. State*, 6 Wn. App. 985, 988-89, 497 P.2d 953 (1972) (citing *Mottner*, 75 Wn.2d 575). There is no contract until the offer is accepted. *Id.*; *Peerless Food Prods., Inc. v. State*, 119 Wn.2d 584, 592, 835 P.2d 1012 (1992) (acceptance of the bid for public work constitutes a contract on a public works project). Mutual contractual responsibilities begin when the contract is awarded, even though it is contemplated that contract forms will be executed thereafter. *J.J. Welcome*, 6 Wn. App. at 988-89.

¶27 In granting the housing authority's motion for summary judgment, the trial court relied in part on its view that the housing authority's written award did not create a contract. This was error. In *Hadaller v. Port of Chehalis*, 97 Wn. App. 750, 986 P.2d 836 (1999), the court held that the *verbal* award of a public works contract might not create a contract, but the court's reasoning in that case was based on explicit provisions of the bid instructions that the awardee would have a postbid obligation to provide further information acceptable to the port. Here, by contrast, the bid instructions provided that the written award furnished to the successful bidder "shall result in a binding contract without further action by either party." CP at 45. Conditions of the federal funding for the housing authority's project also defined "contract," stating that "[i]n addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards." CP at 61.

¶28 The fact that a contract is ordinarily created by a governmental body's acceptance of a bid does not mean that the apparently resulting contract is always enforceable. As with all contracts, the existence of mutual obligations is premised on the understanding that the parties have assented to the same agreement. A mutual misunderstanding may vitiate objective expressions of mutual assent. RESTATEMENT (SECOND) OF CONTRACTS § 20 (1981); *Shuck v. Everett Sports Cars, Inc.*, 12 Wn. App. 28, 527 P.2d 1321 (1974). A party's contract obligations may be voidable if the

party was unilaterally mistaken as to a basic assumption regarding existing facts, and the other party knew or had reason to know of the mistake or, through fault, caused the mistake. *Associated Petroleum Prods., Inc. v. Nw. Cascade, Inc.*, 149 Wn. App. 429, 437, 203 P.3d 1077 (2009). One party's material breach or failure or a condition precedent will discharge the duty of the other party. *Jacks v. Blazer*, 39 Wn.2d 277, 235 P.2d 187 (1951) (material breach); *Ross v. Harding*, 64 Wn.2d 231, 240-41, 391 P.2d 526 (1964) (condition precedent).

¶29 The housing authority recognized this by its actions. It never took the position that, having awarded the contract in writing to Skyline, it could nonetheless withdraw the award and reject Skyline's bid at a later time with impunity. Rather, it behaved as a party that must be able to articulate a legal justification for contract avoidance. In withdrawing its award and rejecting Skyline's bid, the housing authority pointed to specific terms of the invitation for bids that Skyline violated and conditions and contingencies that Skyline failed to satisfy.

¶30 An apparent contract therefore arose when the housing authority made its written award accepting Skyline's bid. But it quickly became clear that the housing authority took the position that the nonexistence of Skyline's subcontract with McVay Brothers excused the housing authority from executing its owner-contractor agreement with Skyline.[2]

---

[2] McQuillin states that "[a] municipality may withdraw its award of a contract where it finds that the bid was not in conformity with the bid instructions so long as the contract has not yet been executed." McQuillin, *supra*, § 29.72, at 483, 490 n.17 (citing *C.R. Kirby Contractors, Inc. v. City of Lake Charles*, 606 So. 2d 952 (La. Ct. App. 1992) and *City of Philadelphia v. Canteen Co.*, 135 Pa. Cmwlth. 575, 581 A.2d 1009 (1990) in support); *and see Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992). In *Canteen* and *Planning Research*, the disappointed awardee pursued an action to enjoin award of the contract to another bidder, or another protest procedure. As a result, the issue of whether the disappointed awardee's bid materially conformed (or did not) could be determined before the governmental body proceeded. Here, Skyline is correct that the issue of whether its bid materially conformed has not been determined. But the reason

II

■ ¶31 Had this not been a public works contract, a decision by the housing authority to repudiate the agreement with Skyline and contract with WRS would have subjected it to a claim by Skyline for damages for breach of contract. But Skyline was not entitled to proceed with its claim for monetary damages here because a second principle applicable to public works contracts comes into play. Skyline did not pursue its claim that the contract was wrongly awarded to WRS in the only way permitted: by seeking injunctive relief.

¶32 It has long been the generally accepted rule that, presented with a claim by a "bidder on a public work contract who feels aggrieved by the action of the government," the courts will interfere with the governmental body only by injunction; the remedy of monetary damages is not available. *Mottner*, 75 Wn.2d at 579-80. In *Peerless*, a case involving a low bidder whose bid was wrongly rejected as nonresponsive, the basic reasoning for denying a remedy for damages was explained:

> "[W]hile equitable, extraordinary, or declarative relief may serve the public interest by preventing the award and execution of a contract for an excessive amount, permitting damages in such cases serves the bidder's interest alone, and is contrary to the public interest the competitive bidding laws were designed to protect, *further burdening a treasury already injured by paying too high a price for the goods or services."*

119 Wn.2d at 591 (quoting James L. Isham, Annotation, *Public Contracts: Low Bidder's Monetary Relief Against State or Local Agency for Nonaward of Contract*, 65 A.L.R. 4TH 93, 99 (1988)). As further explained by the court, "This policy seeks not to make the public suffer *twice*: first, for the award of an excessive contract to one not the lowest bidder;

why is because—unlike the plaintiffs in *Canteen* and *Planning Research*—it elected not to pursue an injunction.

and second, for the additional payment of lost profits to an unsuccessful bidder who is not performing the contract. . . . [P]rotecting the public treasury has priority over compensation for bidders wrongfully rejected." *Id.* at 591-92.

¶33 A disappointed bidder on a public works project is limited to suing to enjoin execution of the contract with another. *BBG Grp., LLC v. City of Monroe*, 96 Wn. App. 517, 521, 982 P.2d 1176 (1999). By restricting a bidder to the remedy of injunctive relief before a contract is signed, "all parties are interested in as quick and fair a settlement of the issue as possible" and courts "allow relief to bidders that does not compete with the public interest and is consistent with a mutual public interest in public contracts being performed by the lowest bidder." *Peerless*, 119 Wn.2d at 596, 597; *BBG Grp.*, 96 Wn. App. at 521 (limited remedy is to "sue for injunctive relief before a contract is signed").

¶34 Skyline argues that these cases limiting the rights of aggrieved bidders apply only to bidders who are never awarded the contract. It argues that the cases have no application to a successful bidder whose award is withdrawn. The parties did not cite, nor could we find, a case that addresses whether an awardee divested of its award by the contracting body is, or is not, limited to an injunctive remedy. *But cf. BBG Grp.*, 96 Wn. App. at 521-22 (holding that a contractor who claimed to have been *orally* notified it would be awarded the contract could not sue for damages when the formal award went to a competing bidder). In several cases, disappointed awardees have sought to enjoin the governmental body's entry into an award with another bidder without questioning that injunction is the exclusive remedy. *See* note 2, *supra*.

¶35 Skyline's argument—that a governmental body's right to have award disputes resolved in injunctive proceedings applies only to disputes with nonawardees—depends on a fundamentally false distinction. Every time a disappointed bidder challenges an award of a contract to someone else, the interests of three parties are implicated: the

disappointed bidder, the awardee, and the governmental body. If an injunctive proceeding is pursued, both the awardee and the bidder challenging the award will need to appear and present their claims to the contract.

¶36 Here, Skyline recognized by its actions that an awardee's rights can be challenged anytime before execution of an agreement. After all, it successfully protested the housing authority's initial award of the contract to WRS. The result was that the housing authority refused to execute its owner-contractor agreement with WRS despite WRS's contractual rights arising from the initial award. Skyline does not suggest that when its own protest was successful and the award to WRS was withdrawn, WRS enjoyed a right to pursue a claim for damages for breach of contract.

¶37 Nor can Skyline reasonably argue that it stands on a different footing because its award was withdrawn as the result of the governmental body's unilateral decision rather than as the result of a competitor's protest. That distinction would be arbitrary. The awards to WRS, and later to Skyline, were withdrawn after information was presented to the housing authority suggesting that first WRS, and later Skyline, was not the lowest reliable, responsive bidder. WRS's award was withdrawn on the basis of some information. Skyline's award was withdrawn on the basis of more information. It defies reason to treat the housing authority's decision to withdraw an award differently based on the source of its information that it has awarded a contract in violation of the criteria published in its invitation for bids.

¶38 Most importantly, the distinction that Skyline would make between its situation and that of the disappointed bidders whose remedies were limited in *Mottner, Peerless, BBG Group*, and other Washington cases is irrelevant, given the policy justification for making the injunctive remedy exclusive.

¶39 Public bidding is required for government contracts, among other objectives, to " 'prevent ... improvidence in the

administration of public business, as well as to insure that the [governing body] receives the best work or supplies at the most reasonable prices practicable.' " *Gostovich v. City of West Richland*, 75 Wn.2d 583, 587, 452 P.2d 737 (1969) (quoting *Edwards v. City of Renton*, 67 Wn.2d 598, 602, 409 P.2d 153 (1965)). Although a secondary purpose for the requirement of public bidding is for the benefit of those interested in undertaking public projects, it is not for any bidder's individual financial benefit; rather, it is "to provide a fair forum for those interested in undertaking public projects," such that "[i]f there are material irregularities in the bidding process, the [governing body] should not accept the offensive bid." *Id.* A bid containing a material variance is nonresponsive. *Cornell Pump Co. v. City of Bellingham*, 123 Wn. App. 226, 232, 98 P.3d 84 (2004) (citing *Land Constr. Co. v. Snohomish County*, 40 Wn. App. 480, 482, 698 P.2d 1120 (1985)). The policy reason for requiring disputes to be resolved in an expedited proceeding applies equally whether a competitor or the governing body itself first recognizes that a public works contract has been awarded in violation of the invitation for bids.

¶40 Skyline's exclusive remedy was to seek to enjoin the housing authority's entry into an agreement with WRS. It elected not to pursue that remedy. Summary judgment dismissal of its claim for damages was appropriate.

### III

¶41 Both parties have raised issues of attorney fees.

¶42 Skyline challenges the trial court's award of fees to the housing authority based solely on the trial court's asserted error in granting summary judgment. Our decision that there was no error disposes of that fee issue.

¶43 The housing authority seeks an award of attorney fees on two bases. First, it asserts a right to fees under the terms of the contract asserted by Skyline to exist, which included the owner-contractor agreement. Section 12.2 of

that agreement provides that the prevailing party in an action to interpret or enforce the contract shall recover fees and costs. It relies in the alternative on RCW 39.04.240(1), which extends entitlement to fees under RCW 4.84.270 to actions arising out of public works contracts in which a public body is a party. Under RCW 4.84.270, a defendant is entitled to an award of attorney fees "if the plaintiff . . . recovers nothing."

¶44 The housing authority's request and argument complies with the requirements of RAP 18.1. Skyline does not dispute the housing authority's right to recover reasonable attorney fees and costs under applicable law. We award the housing authority attorney fees and costs subject to its compliance with RAP 18.1(d).

¶45 Affirmed.

KORSMO, C.J., and SWEENEY, J., concur.